UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JOYCE CHRISTIE, Individually, and On Behalf of the Estate and Next of Kin of Nicholas T. Christie, Deceased

Plaintiff

vs.

CASE NO. 2:10-cv-420-FtM-99DNF

MIKE SCOTT, Individually and in His Official Capacity as Sheriff of Lee County, Florida, PRISON HEALTH SERVICES, INC., a Tennessee Corporation, DEPUTY DANIEL FALZONE, DEPUTY KURTIS CALHOUN, DEPUTY DATHAN S. PYLE, DEPUTY JEREMY HARDIN, DEPUTY ANDRE DIMARCO, SERGEANT ARMANDO CROKER, SERGEANT MARY DAROSS, SERGEANT ROBERT BRAMBLET, LIEUTENANT MICHAEL PEAK, MARIA CANETE, R.N., LINDA SUNDO, L.P.N., NATALIA SAUNDERS, R.N., JOAN WINNIE, R.N., GERALDINE JONES, R.N., JANICE STEPNOSKI, L.C.S.W., KAREN OVERBEE, CHRISTINE ATEN, TAMMY HAMILTON, R.N., and KATHRYN T. HOLLIER, C.N.A.

JUDGE: UNASSIGNED

MAGISTRATE JUDGE DOUGLAS N. FRAZIER

Defendants

**PLAINTIFF'S MOTION TO LIMIT THE NUMBER OF CAUSATION EXPERTS**

Now comes Plaintiff, Joyce Christie, individually and on behalf of the Estate of Nicholas T. Christie, deceased, by and through counsel, and moves this Court for an order limiting all parties to the use of two medical experts to opine on the issue of Mr. Christie's death. Defendant Prison Health Services, Inc. ("PHS") and its employees, Maria Canete, R.N., Linda Sundo, L.P.N., Natalia Saunders, R.N., Joan Winnie, R.N., Geraldine Jones, P.A., Janice Stepnoski, L.C.S.W., Karen Overbee, R.N., Christine Aten, Tammy Hamilton, R.N., and Kathryn T. Hollier, C.N.A., (collectively the "Medical Defendants") have identified and submitted the reports of five medical experts, each of whom provides causation opinions in an effort to discredit the official cause and mechanism of Nicholas Christie's death as expressed in the official death certificate and autopsy report of the Lee County Medical Examiner, Robert Pfalzgraf, M.D. These opinions, however, are largely cumulative. Indeed, they offer substantively identical explanations of the cause and mechanism of Nicholas Christie's death and all are based on a review of the same records, reports, and related documents. The needlessly cumulative and prejudicial effects of these repetitive opinions substantially outweigh any probative value. Furthermore, given the duplicative nature of the proffered opinions, the fact that these experts are located across the United States, and the significant cost involved in deposing and properly investigating these experts, discovery regarding these experts is substantially likely to cause unnecessary burden and expense. For the

reasons stated herein, Plaintiff respectfully requests an order limiting each party to the use of two causation experts.

## I. BACKGROUND OF THE CASE

This is a civil rights wrongful death action brought by Plaintiff Joyce Christie on behalf of her late husband, Nicholas T. Christie. Mr. Christie was detained at the Lee County Jail[1] from on or about March 25-26, 2009, and March 27-30, 2009. At all times relevant, Nick was under the care, custody, and control of the Lee County Sheriff's Office ("LCSO") and PHS, a Tennessee corporation contracted by LCSO to provide medical and mental health care, treatment, and assessment to those detained at the Lee County Jail.

During his first period of detention (March 25-26, 2009), Nicholas Christie disclosed to and placed LCSO and PHS on notice that he suffered from multiple serious medical conditions, including, Chronic Obstructive Pulmonary Disease, a "heart condition," cardiovascular disease, atrial fibrillation, obesity, Gout, back pain, constipation, and umbilical hernia, all of which was recorded and documented in his Lee County Jail medical chart/record. (*See* Fourth Amended Comp. (Oct. 12, 2011) (Doc. No. 113) at ¶ 36.) During both periods of detention, both Joyce and Nick Christie repeatedly informed LCSO that Mr. Christie was acutely and chronically mentally and physically ill and unstable and required immediate hospitalization and medical and psychiatric evaluation, assessment, intervention, referral, and care, that

[1] Capitalized terms not defined in this Motion are defined in Plaintiff's Fourth Amended Complaint (Oct. 12, 2011) (Doc. 113).

he had a heart condition, and that her husband did not have access to and had not been taking his prescription medication. (*Id.* at ¶ 42.)

During his first period of detention, Nicholas Christie disclosed to and placed LCSO on notice of the following prescription medications he was required to take: Albuterol®, Allopurinol®, Vicodin®, and Digoxin® for his "heart condition," all of which was recorded and documented in Mr. Christie's Lee County Jail medical record/chart. (*Id.* at ¶ 37.) During both periods of detention, Nicholas Christie carried with him and Defendants took possession of a list of each prescription medication he took, including the dosage and frequency with which he took each medication, and the name of the prescribing physician for each drug. The list included: Digoxin®, Vicodin®, Lasix®, Paratonox®, Lexapro®, Clonozapam®, Potassium, Coumadin®, Allopurinol®, and Albuterol®/Nebulizer inhaler. (*Id.* at ¶ 43.) Finally, during his first period of detention, it was recorded in Nicholas Christie's Lee County Jail medical chart/record that he last took his prescription medications two days prior to being detained – March 23, 2009.

During the intake process of his second period of detention at the Lee County Jail, from on or about March 27-29, 2009, neither LCSO nor PHS performed and/or ordered any medical or mental health screening, assessment, evaluation, or referral, and did not review their own records and information created during Nicholas Christie's first period of detention, which at all times was in LCSO and PHS's possession. LCSO and PHS took no steps to ensure that Nicholas Christie was given the numerous prescription medications that he needed.

While detained at the Lee County Jail on a misdemeanor trespass charge, Nicholas Christie was repeatedly subjected to multiple oleoresin capsicum ("O.C.") spray and fogger applications and hours of restraint, strapped naked to a chair with a hood over his head, while inside a jail cell. After being sprayed and/or fogged with O.C. no less than 10 times from March 27-29, 2009, without proper decontamination and without proper medical evaluation, treatment, or care, and strapped to a chair with a hood over his face for hours, Nicholas Christie was noted to be in respiratory distress and was eventually transferred to Gulf Coast Medical Center in Fort Myers, Florida. (*Id.* at ¶ 47.) At Gulf Coast Medical Center, Nicholas Christie suffered multiple cardiac arrests and was pronounced dead on March 31, 2009. (*Id.* at ¶ 48.) On April 29, 2009, the Lee County Medical Examiner issued a Certificate of Death declaring Nicholas Christie's manner of death a homicide. (*Id.* at ¶ 49.) The official causes of death, as determined by the Lee County Medical Examiner, are hypoxic encephalopathy (brain damage caused by inadequate oxygen supply) following resuscitation for cardiac arrest, cardiogenic shock with congestive heart failure, and physiologic stress following restraint and noxious effects of O.C. (*Id.* at ¶ 49.)

The Medical Defendants share a unified interest in this litigation and are represented by the same counsel. The Medical Defendants have identified five medical experts to provide causation opinions in an effort to discredit the official cause and mechanism of Nicholas Christie's death as expressed in the official death certificate and autopsy report of the Lee County Medical Examiner. Specifically, the Medical Defendants now claim for the first time that emergency room physicians at

Gulf Coast Medical Center breached the standard of care by administering Cardizem®, which killed Mr. Christie. The experts identified by the Medical Defendants are Robert D. Jones, M.D., Family Medicine, Michael E. Mullins, M.D., Emergency Medicine, Kris Sperry, M.D., Forensic Pathology, Joel K. Kahn, M.D., Cardiology, and Richard A. Matthay, M.D. Pulmonology. (*See* Expert Report of Robert D. Jones, M.D. (Mar. 5, 2012), attached as Exhibit A; Expert Report of Michael E. Mullins, M.D. (Mar. 7, 2012), attached as Exhibit B; Expert Report of Kris Sperry, M.D. (Mar. 12, 2012), attached as Exhibit C; Expert Report of Joel K. Kahn, M.D. (Mar. 9, 2012), attached as Exhibit D; Expert Report of Richard A. Matthay, M.D. (Mar. 2, 2012), attached as Exhibit E.) In forming their opinions as to the cause of Nicholas Christie's death, the Medical Defendants' experts have relied on an identical body of evidence, information, and materials. (*See* Exhibit A at 9-11; Exhibit B at 5-7; Exhibit C at 5-7; Exhibit D at 3-5; Exhibit E at 3-5.) These materials consist primarily of Nicholas Christie's medical, jail, and autopsy records, Plaintiff's Fourth Amended Complaint, and the statements and depositions of numerous witnesses and parties. None of the experts identified by the Medical Defendants treated Nicholas Christie or otherwise has personal knowledge of the matters in this case.

All of the Medical Defendants' experts, after reviewing the same documents, materials, and information, have offered the substantively identical opinion that Nicholas Christie's death was not caused by his prolonged exposure to O.C., restraint, or other acts or omissions of the Medical Defendants. In their reports,

rather, the Medical Defendants' experts now claim that Mr. Christie's death was caused by the allegedly inappropriate administration of Cardizem® (Diltiazem), a calcium-channel blocker, after the Medical Defendants sent Nicholas Christie to Gulf Coast Medical Center on March 29, 2009. Dr. Jones opines that "Mr. Christie's death was due to the administration of Cardizem 25 mg intravenously . . ." at Gulf Coast Medical Center. (*See* Exhibit A at 1.) Dr. Mullins opines that "[e]xposure to oleoresin capsicum (OC) 'pepper spray' did not cause or contribute to cause the death of Nicholas Christie" and "[b]ehavioral restraint in a restraint chair did not cause or contribute to cause the death of Nicholas Christie" but, rather, the Gulf Coast Medical Center's "[m]ismanagement of Mr. Christie's respiratory distress while he was in the Emergency Department at Gulf Coast Medical Center was the proximate cause of the cardiopulmonary arrest ("Code Blue") which resulted in hypoxic encephalopathy (brain damage from lack of oxygen) . . . ." (*See* Exhibit B at 1-3.) Specifically, Dr. Mullins concludes that "[t]he inappropriate administration of diltiazem [Cardizem®] removed the compensatory effect of his tachycardia and directly precipitated the first cardiopulmonary arrest 21 minutes later." (*Id.* at 3.) Similarly, Dr. Sperry opines that "[t]he utilization of the pepper spray did not cause nor contribute to Nicholas Christie's death. . . Thus, it is my opinion, to a reasonable degree of medical certainty, that the cardiac arrest, which culminated in irreversible brain damage, was precipitated by the Cardiazem administration." (*See* Exhibit C at 1-2.) Likewise, Dr. Kahn submits that "Mr. Christie's death on March 29, 2009 was the result of the consequences of an asystolic and hypotensive cardiac arrest

caused by administration of IV medication used to treat his arrhythmia in the emergency center of Gulf Coast Medical Center. . . . He developed atrial fibrillation with a rapid response (ECG at 1522 had HR 160) and received 25 mg Cardizem IV at 1610. . . Were it not for the medication administration, Mr. Christie would not have arrested and would have been expected to survive the hospitalization." (*See* Exhibit D at 1-3.) Finally, Dr. Matthay repeats that "Mr. Christie received care below the appropriate standard of care in the GCMC Emergency Department on 03/29/09 which led to his cardiac arrest and subsequent death. Specifically, this patient received Cardizem at a large dose of 25 mg IV on or about 4:10 p.m. . . . In the opinion of this reviewer, this agent, Cardizem, profoundly lowered Mr. Christie's blood pressure leading to his cardiac arrest on or about 4:31 p.m. on 03/29/09, and subsequent death on 03/31/09." (*See* Exhibit E at 3.)

Thus, the Medical Defendants, a collection of individuals who share a unified interest in this litigation, have offered the causation opinions of five medical experts who, after reviewing the same evidence relating to Nicholas Christie's medical treatment and care, have each offered the substantively identical opinion that Nicholas Christie's death was caused by cardiac arrest leading to brain damage as a result of the inappropriate administration of Cardizem® at Gulf Coast Medical Center. Because all of the experts will offer the same causation testimony formed upon a review of the same evidence, these opinions are entirely cumulative and the impact of their repetitive testimony is primarily prejudicial. Additionally, the testimony of these individuals will unnecessarily delay the trial in this matter and waste time

and resources. Further illustrating the absence of any legitimate need to present five experts on this issue is the fact that the Corrections Defendants, who are the LCSO staff and personnel, have identified a single expert to render an opinion as to the cause and mechanism of Nicholas Christie's death, Vincent J.M. Di Maio, M.D., a forensic pathologist, and Plaintiff is relying on the official mechanism and cause of death as expressed by the Lee County Medical Examiner, Robert Pfalzgraf, M.D.

Furthermore, the experts identified by the Medical Defendants are located across the United States in Phoenix, Arizona, St. Louis, Missouri, Decatur, Georgia, Detroit, Michigan, and Guilford, Connecticut, resulting in exorbitant travel expenses in addition to the costs of deposing and investigating these experts. Permitting the Medical Defendants to maintain five causation experts who will render identical opinions in an effort to discredit the single official cause and mechanism of Nicholas Christie's death adds unnecessary and undue expense to this litigation and will necessarily and substantially prolong the trial in this case.

Pursuant to Middle District of Florida Local Civil Rule 3.01(g), Plaintiff attempted to resolve this dispute without the Court's intervention. (*See* Letter to Gregg A. Toomey, Counsel for the Medical Defendants, from Counsel for Plaintiff (Mar. 13, 2012) attached as Exhibit F.) The Medical Defendants, however, have refused Plaintiff's request to confer on this matter. Therefore, Plaintiff seeks this Court's intervention. For all the reasons stated herein, the Court should restrict the Medical Defendants, and all parties in this litigation, to the use of two causation experts.

## II. <u>LAW AND ARGUMENT</u>

### *A. This Court Should Limit PHS To Two Medical Causation Experts To Avoid Unnecessary Proof And Cumulative Evidence Pursuant To Fed. R. Civ. P. 16.*

This Court is vested with discretion to limit the number of experts in this matter. Federal Rule of Civil Procedure 16(c)(2)(D) empowers a court to impose orders "limiting the use of testimony under Federal Rule of Evidence 702" so as to avoid "unnecessary proof and cumulative evidence." Fed. R. Civ. P. 16(c)(2)(D). Rule 16(c)(2)(D) is used to help "secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Under Fed. R. Civ. P. 16(c)(2)(D), allowing restrictions on testimony and providing for the avoidance of unnecessary or cumulative evidence, the court may limit the number of expert witnesses a party may present at trial. *See Riley v. Dow Chemical Co.,* 123 F.R.D. 639, 640 (N.D. Cal. 1989) ("With respect to the request to limit the number of experts at trial, the Court has authority, articulated in [current Fed. R. Civ. P. 16(c)(2)(D)], to take action for the 'avoidance of unnecessary proof and of cumulative evidence'") (alteration added).

The Federal Rules of Civil Procedure authorize the trial court to "consider and take appropriate action" in a manner "facilitating in other ways the just, speedy, and inexpensive disposition of the action." Fed. R. Civ. P. 16(c)(2), 16(c)(2)(P). Indeed, "[e]ven when proposed expert testimony might be admissible under the standards of Rules 403 and 702 of the evidence rules, the court may preclude or limit such testimony if the cost to the litigants—which may include the cost to adversaries of

securing testimony on the same subjects by other experts—would be unduly expensive given the needs of the case and the other evidence available at trial." *See* Advisory Committee Notes to 1993 Amendments to Fed. R. Civ. P. 16(c). *See also Planned Parenthood of Cent. New Jersey v. Verniero*, 22 F.Supp.2d 331, 339 (D. N.J. 1998) ("A trial judge can limit the number of expert witnesses pursuant to *Fed.R.Civ.P.* 1 and 16. Both rules permit a court to use its 'great powers' to streamline a trial so long as each side presents all expert testimony and evidence necessary to assist the trier of fact. Cumulative witnesses are unnecessary if their only purpose serves to assist the trier of fact on a previously illustrated issue.").

Under the record of this case, the Medical Defendants can fully support their theory of the cause and mechanism of Nicholas Christie's death with two medical experts. Drs. Jones, Mullins, Sperry, Kahn, and Matthay render identical opinions regarding the cause of Nicholas Christie's death. Moreover, the Medical Defendants' experts reached their conclusions after reviewing the same body of materials, and none of the identified experts treated Nicholas Christie or otherwise brings a unique perspective from which to offer his opinion about the cause and mechanism of Nicholas Christie's death. The identification of five causation experts is excessive given the needs of this case. Further demonstrating the absence of any need to present the testimony of five experts on this issue is the fact that the Corrections Defendants have identified a single expert, Dr. Di Maio, and Plaintiff is relying on the official cause and mechanism of death as expressed by the Lee County Medical Examiner.

Given the cumulative nature of these expert opinions and the evidentiary needs of the case, the burdens and costs imposed in traveling throughout the United States to conduct depositions and to otherwise complete discovery and investigate these experts can only be considered undue. Moreover, the presentation of opinion testimony on issues already presented offers little assistance to the trier of fact and causes needless delay and wastes resources. Because the Medical Defendants can fully present all testimony necessary to attempt to discredit the official cause and mechanism of Nicholas Christie's death with two causation experts, the Court should restrict all parties to the use of no more than two causation experts, thereby streamlining this litigation and reducing unnecessary litigation costs.

***B. This Court Should Restrict All Parties To The Use Of Two Medical Causation Experts To Prevent Unfair Prejudice, Confusing The Issues, Undue Delay, And The Needless Presentation Of Cumulative Evidence Pursuant To Fed. R. Evid. 403.***

The decision to admit, exclude, or limit expert witness opinion testimony is within the broad discretion of the trial court. *See, e.g., Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1315 (11th Cir. 2005) ("District courts have broad authority over the management of trials. Part of this authority is the power to exclude cumulative testimony.") (citation omitted); *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). In this matter, the Court's discretion is derived from its inherent authority to control the litigation before it and Rule 403 of the Federal Rules of Evidence. Fed. R. Evid. 403 provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:

> unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403.

Litigants have no right to present needlessly time consuming, cumulative, confusing, or misleading evidence. Accordingly, "[e]xclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury or if the expert testimony is cumulative or needlessly time consuming." *Frazier*, 387 F.3d at 1263 (citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)). *See also United States v. Stevens,* 935 F.2d 1380, 1399 (3d Cir. 1991) (finding expert testimony properly excluded because its probative value was outweighed by concerns of "undue delay, waste of time, or needless presentation of cumulative evidence"). It is well settled that "[e]xpert testimony may be needlessly cumulative where there is 'substantial overlap' between the areas on which two experts will testify." *Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, No. 10-21511-CIV, 2010 WL 4225947, at *2 (S.D. Fla. Oct. 21, 2010) (citing *Price v. Fox Entm't Grp., Inc.,* 499 F.Supp.2d 382, 390 (S.D.N.Y. 2007)).

In *Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1315 (11th Cir. 2005), the Eleventh Circuit explained that district courts have broad authority to exclude expert evidence on the basis of its cumulative nature pursuant to Fed. R. Evid. 403. In *Tran*, a products liability case alleging negligence and strict liability in the manufacture, design, and testing of a seatbelt system, the plaintiff sought to introduce the testimony of her treating physician and two retained medical experts.

*Id.* at 1314-15. The district court excluded the testimony of the second medical expert holding that the testimony was needlessly cumulative given the available testimony of the treating physician and the other retained expert. *Id.* at 1315. On appeal, the Eleventh Circuit held that the trial court appropriately exercised its discretion in excluding the expert explaining:

> Drs. Burton and Clark relied on the same medical evidence in forming their opinions. In addition to testimony about the collision and inertial forces, Dr. Burton testified about Tran's neck injury and the impact of the seat belt. These "micro" issues are the same as those about which Dr. Clark would have testified. Moreover, the treating physician, Dr. Cheatham, testified about Tran's injury as well. In sum, Tran presented extensive testimony to the jury suggesting that the seat belt caused her injury, and it is not at all clear that Dr. Clark would have added any different information that Tran could not have presented through Drs. Burton and Cheatham.

*Id.* at 1315. The court reached this conclusion even though "[t]he testimony likely would not have unduly prolonged the trial," the excluded expert's "practice and experience was somewhat different from that of the other doctors," and the plaintiff "might have presented her evidence differently had she known earlier that [the expert] would be excluded." *Id.* at 1316. Consequently, because there was substantial overlap between the anticipated opinion of the second expert and the opinions that were or could have been presented by the treating physician and the first medical expert, the additional testimony was needlessly cumulative, and the district court rightly excluded the testimony under Fed. R. Evid. 403. *Id.*

In this case, once the Medical Defendants have elicited the testimony of one of their experts concerning the cause and mechanism of Nicholas Christie's death, the probative value of each additional expert's testimony is decidedly slight in that it merely echoes the testimony of all preceding experts. These experts have reviewed the same body of evidence and based on this review, they have offered substantively identical opinions concerning the cause and mechanism of Nicholas Christie's death. This overlapping testimony can only be described as cumulative.

While the probative value of repeatedly presenting the same evidence is minimal, the danger of unfair prejudice, confusing the issues, misleading the jury, and needlessly presenting cumulative evidence is great. As the Eleventh Circuit has recognized, these risks arise from the fact that "expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Frazier*, 387 F.3d at 1263. Unnecessarily similar and cumulative expert testimony creates the risk that a jury will resolve differences in expert opinion by counting heads instead of by giving fair consideration to the quality and credibility of each expert's opinions. *Goldstein v. Centocor*, No. 05-21515 COV, 2007 WL 61913, at *2 (S.D. Fla. Jan. 5, 2007) (granting motion to exclude testimony of second expert that was largely cumulative). If the Medical Defendants are allowed to present the causation opinions of five medical experts in an effort to discredit the official cause and mechanism of Nicholas Christie's death as expressed in the official death certificate and autopsy report of the Lee County Medical Examiner, the Medical

Defendants will be afforded an unfair tactical advantage through numerical superiority and through repeatedly presenting the same opinion to the jury. Given the absence of any need to present five experts on this issue, the Medical Defendants' objective is to overwhelm the jury by parading expert after expert over the course of days.

Recognizing these risks, federal courts have explained that "[w]e do want to discourage attorneys from parading additional experts before the court in the hope that the added testimony will improve on some element of the testimony by the principle expert." *Leefe v. Air Logistics, Inc.*, 876 F.2d 409, 411 (5th Cir. 1989) (holding that duplicative medical expert testimony was properly excluded). Indeed, the *Reference Manual on Scientific Evidence* provides:

> If a party offers testimony from more than one expert in what appears to be a distinct discipline, the party should justify the need for it and explain why a single expert will not suffice. Attorneys may try to bolster the weight of their case before the jury by cumulative expert testimony, thereby adding cost and delay. The court should not permit such cumulative evidence, even where multiple parties are represented on one or both sides.

W.W. Schwarzer & J.S. Cecil, "Management of Expert Evidence" p. 48, *Reference Manual on Scientific Evidence, 2d ed.* (Federal Judicial Center, 2000). Even if the jury is instructed otherwise, it is likely that the jury would improperly give weight to the number of experts offered by Defendants rather than simply weighing the quality and credibility of the expert testimony. Any improper influence on the jurors by the fact that they will hear repetitious opinion testimony on the issue of causation of

Nicholas Christie's injuries should be eliminated by this Court at the earliest opportunity.

Moreover, given the minimal probative value of this duplicative testimony, the delay in the trial of this matter resulting from the presentation of these unnecessary experts can only be considered undue and is nothing more than a waste of time, an independent basis for excluding these experts under Fed. R. Evid. 403. The Medical Defendants can fully and adequately present their theory of Nicholas Christies' death without resorting to the substantially overlapping testimony of multiple experts. Accordingly, this Court should issue an order restricting all parties to no more than two causation experts to eliminate the substantial risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, and needlessly presenting cumulative evidence.

## III. CONCLUSION

For all of the foregoing reasons, this Court should issue an order limiting each party to the use of no more than two medical experts on the issue of Nicholas Christie's death.

**CERIFICATE OF LOCAL RULE 3.01(g)**
**COMPLIANCE**

In accordance with Middle District of Florida Local Civil Rule 3.01(g), the undersigned certifies that he has in good faith attempted to confer with the Medical Defendants' counsel by letter dated March 13, 2012, in an effort to resolve the issues raised by this Motion. (*See* Exhibit F.) The Medical Defendants, however, have refused to respond to Plaintiff's efforts to resolve this matter. Therefore, this Motion is submitted to the Court for consideration.

Respectfully submitted,

s/ Nicholas A. DiCello
WILLIAM HAWAL (OH Bar #0006730) (PHV)
NICHOLAS A. DICELLO (OH Bar #0075745) (PHV)
**SPANGENBERG SHIBLEY & LIBER LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232; (216) 696-3924 (FAX)
*whawal@spanglaw.com*
*ndicello@spanglaw.com*

***Trial Counsel for Plaintiff***

TROY A. RAFFERTY (FL Bar #024120)
VIRGINIA M. BUCHANAN (FL Bar #793116)
**LEVIN PAPANTONIO THOMAS MITCHELL**
**ECHSNER RAFFERTY & PROCTOR P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
(850) 435-7000; (850) 497-7059 (FAX)
*trafferty@levinlaw.com*
*vbuchanan@levinlaw.com*

***Local Counsel for Plaintiff***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 23rd day of March 2012 I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System, which will send the foregoing to the following:

GREGG A. TOOMEY
**BUNNELL & WOULFE, P.A.**
1625 Hendry Street, Suite 203
Fort Myers, FL 33901

***Counsel for Defendants, Prison Health Services, Inc., Marie Canete, R.N., Linda Sundo, L.P.N., Natalia Saunders, R.N., Joan Winnie, R.N., Geraldine Jones, R.N., Janice Stepnoski, L.C.S.W., Karen Overbee, Christine Aten, Tammy Hamilton, R.N., and Kathryn T. Hollier, C.N.A.***

SUMMER M. BARRANCO
RICHARD A. GIUFFREDA
**PURDY JOLLY GIUFFREDA & BARRANCO, P.A.**
2455 East Sunrise Boulevard, #1216
Fort Lauderdale, FL 33304

***Counsel for Defendants, Sheriff Scott, Deputy Falzone, Deputy Calhoun, Deputy Pyle, Deputy Hardin, Deputy DiMarco, Sergeant Croker, Sergeant DaRoss, Sergeant Bramblet, and Lieutenant Peak***

s/ Nicholas A. DiCello
WILLIAM HAWAL (OH Bar #0006730) (PHV)
NICHOLAS A. DICELLO (OH Bar #0075745) (PHV)
**SPANGENBERG SHIBLEY & LIBER LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232; (216) 696-3924 (FAX)
*whawal@spanglaw.com*
*ndicello@spanglaw.com*
***Trial Counsel for Plaintiff***

TROY A. RAFFERTY (FL Bar #024120)
VIRGINIA M. BUCHANAN (FL Bar #793116)
**LEVIN PAPANTONIO THOMAS MITCHELL ECHSNER RAFFERTY & PROCTOR P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
(850) 435-7000; (850) 497-7059 (FAX)
*trafferty@levinlaw.com*
*vbuchanan@levinlaw.com*
***Local Counsel for Plaintiff***