UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
CASE NO. 2:10-CV-420-FtM-36-DNF

JOYCE CHRISTIE, on Behalf of the Estate of Nicholas T. Christie, Deceased,

Plaintiff

vs.

MIKE SCOTT, LEE COUNTY SHERIFF, PRISON HEALTH SERVICES, INC. nka PHS CORRECTIONAL HEALTHCARE, DEPUTY DANIEL FALZONE, DEPUTY KURTIS CALHOUN, DEPUTY DATHAN S. PYLE, DEPUTY JEREMY HARDIN, DEPUTY ANDRE DIMARCO, SERGEANT ARMANDO CROKER, SERGEANT MARY DAROSS, SERGEANT ROBERT BRAMBLET, MARIA CANETE, R.N., LINDA SUNDO, L.P.N., NATALIA SAUNDERS, R.N., JOAN WINNIE, R.N., GERALDINE JONES, R.N., JANICE STEPNOSKI, L.C.S.W., KAREN OVERBEE, CHRISTINE ATEN, TAMMY HAMILTON, R.N., KATHRYN T. HOLLIER, C.N.A.,

Defendants.

**MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]**

Defendants Prison Health Services, Inc. ("PHS"), Maria Canete ("Canete"), Linda Sundo ("Sundo"), Natalia Saunders ("Saunders"), Joan Winnie ("Winnie"), Geraldine Jones ("Jones"), Janice Stepnoski ("Stepnoski"), Karen Overbee ("Overbee"), Christine Aten ("Aten"), Tammy Hamilton ("Hamilton") and Kathryn Hollier ("Hollier) (collectively "Medical Defendants"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 3.01, file this Motion for

1 By extension, this Motion was due Friday, June 8, 2012. Because computer difficulties made timely filing impossible, the Medical Defendants ask that the Motion be deemed timely.

Summary Judgment as follows:

**MOTION**

1. Plaintiff Joyce Christie filed suit in this District, naming the Medical Defendants.

2. The record does not support the claims asserted.

3. Therefore, the Medical Defendants are entitled to summary judgment in their favor.

**MEMORANDUM OF LAW**

## I. Background

### A. Complaint

According to the Complaint, Mr. Christie was detained in the Lee County Jail ("Jail") twice: on March 25 and 26, 2009, and again on March 27-29, 2009 (Complaint ¶3, 35). The Complaint alleges that, during the second detention, law enforcement officials used pepper spray on Christie, the Medical Defendants provided inadequate medical care following the use of pepper spray, and Christie eventually died at a local hospital (Complaint ¶¶ 44, 52-71). Claims against the Medical Defendants are based on state law negligence and federal civil rights.

On March 25, 2009, Mr. Christie was arrested by Lee County deputies, and entered the Jail. At that time, he advised PHS employees that he had the following medical conditions: chronic obstructive pulmonary disease, an otherwise nonspecific "heart condition," cardiovascular disease, atrial fibrillation, obesity, gout, back pain, constipation, and umbilical hernia. He also advised that he was taking the following medications: albuterol, allopurinol, vicodin, and an "unknown medication for his 'heart condition[2]'" (Complaint ¶¶ 36-37).

During the second detention from March 27-29, 2009, the Plaintiff claims that no medical

2 Albuterol is used to treat wheezing and other breathing problems. Allopurinol is a gout medication. Vicodin is a prescription pain medication.

or mental health screening was performed, and PHS employees did not review the information Mr. Christie provided during the first detention, and that Aten, Hamilton or Hollier were responsible for performing these tasks (Complaint ¶¶ 38-41). Also during the second detention, the Plaintiff claims Mr. Christie was pepper-sprayed at least ten times. At approximately 2 p.m. on March 29, 2009, was found to be in respiratory distress, and was taken to Gulf Coast Medical Center, where he suffered multiple cardiac arrests and died on March 31, 2009 (Complaint ¶¶ 46-48). The Medical Examiner determined the manner of death as homicide (Complaint ¶49).

According to the Plaintiff, PHS maintained the following customs or policies that constitute deliberate indifference: fail to or delay medical and mental health screening; fail to or delay providing medications; use excessive force or fail to prevent excessive force; and the creation of deliberately indifferent policies (Complaint ¶¶ 50-53).

## B. The Jail Medical Records[3]

| ***Date*** | ***Time*** | ***Note*** |
|---|---|---|
| **3/25/09** | ***2119*** | **Nurses' Notes – E. Sanchez (Interviewer) & D. Woolley, RN (RN Signing Off)**<br>Intake refused - no.<br>Primary care provider: Dr. Aubtauti - Ohio. Medical referral - no indication. Alert and oriented x3. Urgent/emergent security referral - no. Urgent/emergent mental health referral - no. No mobility restrictions. Height 5'10", Weight 230. Temp 98.3. BP 103/67, P - 87, RR - 18, Pulse Occimetry 97%<br><u>History</u>: No major surgeries or hospitalizations.<br><u>Medications</u>:<br>Medication - Albuterol; 2 puffs twice daily; Last Dose - 3/23/09; Reason - COPD<br>Medication - Unknown; Dosage - daily; Last Dose - 3/23/09; Reason - Heart condition<br>Medication - Allopurinol; Dosage - daily; Last Dose - 3/23/09; Reason - Gout<br>Medication - Vicodin; Dosage - unknown; Last Dose - 3/23/09; Reason - back pain |

3 These records appear in the docket at D.E. 165-1.

Alcohol Use: 3 beers 2 days ago. How often? Seldom.
Chronic Illnesses: denies: asthma, shortness of breath, hospitalization within the last year, etc. Positive for: Cardiovascular disease - Atrial fibrillation. Denies hypertension and not taking meds for hypertension.
Positive for COPD - peak flow 200, 250, 230.
Current significant medical conditions: constipation, umbilical hernia. Referral needed.
Mental Health: [denies any mental health problems, history of psychiatric hospitalizations, etc.]
Disposition: GP, MD sick call expedited, consent, access to care reviewed and grievance process explained.
Blood pressure daily x30 days.

**3/26/09 0015** **Progress Note - D. Woolley, RN**
Seen on 3 West. States heart condition. Declaring medical emergency. I need my meds. Booked this morning. Was disorderly during the day. screened at 2119 tonight. States on Coumadin, Digoxin**,** Albuterol, Vicodin. Pulse oximetry 98%. Heart rate 68. Appears in no acute distress. Hyperactive - insisting on meds tonight. Gets meds from Rite-Aid in Ohio. Unable to verify any meds tonight. Inmate advised.

**3/26/09 0020** **Prescription Verification Form - D. Woolley, RN**
Prescription verification - pharmacy Rite Aid Ohio.
Comments: Unable to verify meds at the location. Not enough information to verify meds - need city in Ohio. **[Note by J.M., RN]**

**3/26/09 0900** **Progress Note - Janet M.**
Transfer at 9:00 a.m., health record review 3/26/09 at 1005. CC-BP x 3 days.

**3/27/09 1443** **Progress Note - N. Saunders, RN**
S: Inmate complained of being sprayed and burning to face and skin.
O: A & O x 3 in no apparently distress. Facial area reddened. Respirations 22. Breathing easily without any wheezing or tachypnea. Non-productive cough. Oral mucosa moist.
A: Altercation in health maintenance.
P: Instructed inmate to flush eyes and skin with cool water. Instructed to notify medical of any changes in condition such as SOB, wheezing, excessive coughing. Inmate verbalizes an understanding.

**3/28/09 0223** Intake Receiving and Screening - refusal attached. **C. Aten, MT**
**3/28/09 0223** **Refusal of Treatment Form - C. Aten, MT (witness) and Theresa Hollier, Med Tech (Witness)**
Refusal of Treatment - refused intake screening. Extremely intoxicated, belligerent, verbally abusive, using profanity. Taken to disorderly by

officer.
Consequences Explained: PHS cannot properly care for inmate medical needs if inmate refuses to disclose information. [witness signature by Theresa Hollier - med tech.]

**3/28/09 1342 Progress Note - M. Canete, RN**
OC sprayed in 1E. No apparent distress, color good, yelling.

**3/28/09 1800 Nurses' Notes - M. Canete, RN**
Mental Health housing recommendation - inmate should be placed on direct observation for mental health reasons on 3A block.

**3/28/09 1800 (Late Entry entered on 4/2/09 @ 1400)**
**Progress Note - M. Canete, RN**
A/C sheet faxed to Classification as inmate was moved to 3A by security**.**

**3/28/09 1802 Progress Note – Linda Sundo**
Called to 3A. 1015 O/C sprayed. No respiratory distress noted, yelling.

**3/28/09 1840 Progress Note - M. Canete, RN**
O/C Sprayed, yelling. No apparent distress. No shortness of breath, skin flushed.

**3/29/09 0505 Progress Note – Evelyn McGraw, LPN**
3A3. Called to check O/C spray. 10-15 was in same cell as person sprayed. No respiratory distress noted.

**3/29/09 0650 Progress Note – Linda Sundo, LPN**
Called to 3A, 10-15 OC Sprayed, no respiratory distress noted.

**3/29/09 0650 Progress Note - Linda Sundo, LPN**
*From Sworn Affidavit*
0650 (3/29/09) I answered a call to 3A to clear the above inmate post O/C spray application. I observed no respiratory distress at this time.

**3/29/09 0720 Progress Note - Lynda Sundo, LPN**
*From Sworn Affidavit*
0720 - I answered a call to 3A to clear the above inmate post O/C spray application. I again observed no respiratory distress. The inmate was yelling.

**3/29/09 0726 Progress Note – Linda Sundo, LPN**
Called to 3A 10-15 OC sprayed, no respiratory distress continues to yell.

**3/29/09 0805 Progress Note – Linda Sundo, LPN**
Called to 3A 10-15, fogged. No respiratory distress noted.

**3/29/09 0805 Progress Note - Linda Sundo, LPN**
*From Sworn Affidavit*
0805 - I answered a call to 3A to clear the above inmate post O/C fogging application. I observed no respiratory distress at this time.

**3/29/09 0847 Progress Note - Joan Winnie, RN**
*From Sworn Affidavit*
At 0847 I went to check on the above inmate for a scheduled restraint check. The restraints were secure.

**3/29/09 0847 Miscellaneous - Penny Winnie and Linda Sundo**
Non-Medical Restraint Flow Sheet - no medical or mental health contraindications to restraints.
Physician G. Jones, P.A. notified at 1350.

| TIME | Left Leg | Right Leg | Left Arm | Right Arm | Waist | Respiratory Status | LOC | Q 2hr FL | Q2hr Limb release | Meals offered | Temp. | Blood Pressure | Pulse | Resp. Rate | Initials |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8:47 | X | X | X | X | X | WNL | Ok NL | na | na | na | Holding for now | | | | PW |
| 9:47 | X | X | X | X | X | Labr. | Ok | na | na | na | - | 143/95 | 111 | | PW |
| 10:47 | X | X | X | X | X | Ok | Ok | na | na | | Holding | | | | PW |
| 11:47 | X | X | X | X | X | OK | Ok | na | na | na | Holding | | | | SS |
| 12:47 | X | X | X | X | X | Labr. | OK | na | na | na | Holding | | | | PW |
| 13:47 | X | X | | X | X | Labr. | Ok | na | na | na | 99 | 100/60 | 96 | Lbr | PW |
| 14:30 | Transferred to Gulf Coast Hospital | | | | | | | | | | | | | | |

**3/29/09 0947 Progress Note - Joan Winnie, RN**
*From Sworn Affidavit*
0947 - I went to check on the above inmate for a scheduled restraint check. The restraints were secure. Respirations labored. Sgt. DaRoss notified with concern of the inmate's respiratory status. I requested the inmate be showered to remove O/C spray and allow re-assessment of the inmate post-shower.

**3/29/09 1000 (Late entry entered 4/2/09 at 1405)**
**Progress Note - Joan Winnie, RN**
Sgt. DaRoss called by this writer to request a shower for inmate. Inmate taken to 1E shower room and showered by security at approximately 10:15

a.m. After the shower inmate's pulse ox was 95% and breathing easier.

**3/29/09** **Progress Note – Maria Canete**
1015 (inmate) O/C Sprayed. Breathing labored. O/C Sprayed covering inmate. Unable to take vital signs, inmate placed in restraint chair 0847.
Sgt. Daross Notified

**3/29/09** **Progress Note - Maria Canete, RN**
From Sworn Affidavit
1015 -I was called to assess this inmate who has been O/C sprayed. I noted his breathing to be labored.

**3/29/09 1015** **Progress Note - Joan Winnie, RN**
*From Sworn Affidavit*
1015 - I reassessed the inmate as he was being removed from the shower area in the restraint chair. Pulse oximetry was 95%. Respirations easier.
1047 - I went to check on the inmate for a scheduled restraint check. Respirations less labored this time.

**3/29/09 1047** **Progress Note - Joan Winnie, RN**
*From Sworn Affidavit*
1047 - I went to check on the inmate for a scheduled restraint check. Respirations less labored this time.

**3/29/09 1147** **Progress Note - Linda Sundo, LPN**
*From Sworn Affidavit*
1147 - I went to 3A to assess the above inmate for a scheduled check in the restraint chair. I observed no distress.

**3/29/09 1200** **Progress Note - Joan Winnie, RN**
*From Sworn Affidavit*
1200 - I was called to the lobby area to speak with the inmate's spouse. The spouse related that she had medical information in her possession and handed it to me. I requested the spouse allow me to copy the medical information, specifically requesting the medications the inmate was on. The spouse refused stating, "I rather you didn't take the papers from me." I asked her if she was here to bond him out and she stated, "I don’t want to take him out of here. I want him to go to the hospital." When I requested what she meant for clarification, she said he needed to be in a mental health place and that this was what she was trying to accomplish when she notified law enforcement. The spouse related that the inmate had not been taking his medication as prescribed.

**3/29/09 1200** **Progress Note – Joan Winnie, RN**
**(Late entry)**
Inmate's wife came to lobby with RX’s, (multiple). Refused to leave the

papers or have us make copies. At this time we have no medical history on this inmate. Obtained wife's phone number from detention officer - M.H., will contact wife ASAP (Janice S.)

**3/29/09 1200 Progress Note – Joan Winnie, LPN**
Spoke with wife and read that inmate was on Coumadin, [illegible]. Attempted to explain we needed the information regarding medication and treatment and wife refused to allow copies of the information. RN Canete notified as stated in R. Canete's notes.

**3/29/09 1247 Progress Note - Joan Winnie**
**(Late entry entered 4/2/09 at 1410)**
During restraint log check inmate with poor color and labored breathing. Oxygen requested and started at 4 liters per minute. Requested inmate be transferred to medical floor at approximately 1330. Inmate arrived on med floor and remained in restraint chair and placed in 2E shower room. At approximately 1347, vital signs taken. Charge nurse notified, G. Jones, P.A.

**3/29/09 1247 Progress Note - Joan Winnie, RN**
*From Sworn Affidavit*
1247 - I was called by the officer to assess the inmate. I observed the inmate's color was poor with labored respirations. Pulse oximetry range 84-88%. I called the charge nurse to bring Oxygen. Oxygen was applied at 4L via mask. Inmate was transported to the medical floor at this time. Once the inmate was brought to the medical floor, his labored breathing subsided.

**3/29/09 1347 Progress Note - Joan Winnie, RN**
*From Sworn Affidavit*
1347 - vital signs, temperature 99, BP 100/80, pulse 96. Respirations became labored unrelated to O/C spray and with the O2 on. The charge nurse called the provider and received orders to transport to the ER via ambulance.

**3/29/09 1400 Progress Note – Maria Canete**
Transported to GCH ER. Report given to 911 operator.

**03/29/09 1400 Nurses' Notes - M. Canete, RN**
ER Referral.
S: "I hot - need air"
O: T - ? P - 96, RR - labored, BP 100/80, Pulse Oximetry 95% on 4 liters O2 via mask
Current Medications: Info not available.
A: Alteration in respiratory status.

P: Notify physician - orders received to transport to ER at Gulf Coast.
ER Contact - Case discussed with Shay (nurse)

**3/29/09 1400 Nurses' Note - M. Canete, RN**
Emergency Medical Clearance Form - Inmate has been pepper sprayed multiple times since yesterday morning. Today post O/C spraying it was observed inmate was having difficulty in breathing. O2 started, brought to medical. G. Jones, P.A. notified. Inmate to be transferred to GCH ER. VS: BP 100/80, Pulse 96, Respirations labored, SAO2 95. Transferred by ambulance.

**3/29/09 1400 Progress Note - Maria Canete, RN**
From Sworn Affidavit
1400 - I reassessed this inmate and request that he be transferred to the medical floor for further assessment. I notified Geraldine Jones, P.A. and reported the inmate's status. I received orders to transport to Gulf Coast ER, I called 911.

3/29/09 **1626 Progress Note - Janice Stepnoski, LCSW** Mental health note - writer unable to see inmate due to medical issues. Writer spoke to inmate's wife who is very concerned about his arrest and treatment. She states inmate has a history of CHF, chronic emphysema and drinking. He is currently on meds but she wishes that only she can administer meds. She refused to let writer know where we can obtain med info. Inmate wife states he has been chemically unbalanced but he has not been treated for psych. issues. She did admit inmate on Digoxin/Lexapro as meds. Writer encouraged her to call with info so inmate could have health/meds verified. Will continue to provide support.

**3/29/09 1700 Progress Note - M. Canete, RN**
Called GCH ER to check on status of inmate, told no info could be given due to HIPAA. Called Sgt. on duty at 5:00 p.m., he has not heard any update as of yet.

### C. Deposition Testimony[4]

Saunders is a registered nurse, employed by PHS for eight years prior to her deposition [D.E.165-3-7-8]. Her only interaction with Mr. Christie was on Friday March 27, 2009, and she was only covering a shift for another nurse [D.E.165-3-52]. She was called to a “D cell” at about 2:30 p.m. to clear Mr. Christie after the use of pepper spray. As was always true in performing

4 The depositions are in the record, and will be cited as “D.E.165-exhibit-page.” The page numbers are those in the ECF system.

this task, her primary concern was whether the patient was breathing in an acceptable manner. She determined that Mr. Christie was not in distress [D.E.165-3-52-53, 56-58].

Following her assessment, Saunders accessed the database maintained by the Sheriff's Office, learning Mr. Christie was booked in the Jail two days earlier. With this information, she attempted to obtain the medical records from the previous incarceration. The records were not at the main jail, so Saunders called a clerk at the CORE facility [D.E.165-3-58- 61]. When she did not hear back from the clerk and after her shift ended, Saunders went to the Core facility to look for the records, but they were not found [D.E.165-3-66].

Aten was a certified nursing assistant when she worked in the Jail, but previously was employed as a surgical technologist and first assistant for 21 years [D.E. 165-4-7]. Aten attempted to obtain a medical history from Mr. Christie during the second detention, and her only function in the jail was this process [D.E. 165-4-10]. At the time, she worked a 10 p.m. to 6:30 a.m. shift, but may have been working 9 p.m. to 5:30 a.m. [D.E. 165-4-11, 34]. She and Kathryn Hollier were the screeners. Hollier's only interaction was to cosign the refusal of treatment form as a witness [D.E.165-4-43-44].

Patients refused intake several times a week [D.E.165-4-22], and sometimes could not be screened because they were combative, disorderly or intoxicated, but she tried to do the intakes within an hour of arrival [D.E.165-4-22-23, 25-26].

She could not access previous meds. Once the intake is filled out, it goes to the nurse [D.E.165-4-26-28, 33]. In this case, Mr. Christie refused to provide any medical information, so she informed the nurse. The nurse came to the booking area, and the nurse informed Aten that Mr. Christie was in the Jail a few days previously. According to Aten, the nurse tried to get Mr. Christie to provide information, but he refused [D.E.165-4-29-31, 33-34, 40].

PHS' policy was to get patients on medications as soon as possible, after verification [D.E. 165-4-38-39].

Hamilton has been a registered nurse for ten years [D.E.165-5-5]. On March 28, 2009, she worked the 7 p.m. to 7 a.m. shift, and reviewed the intake form filled out by Aten, which indicated Mr. Christie refused to provide any medical information [D.E. 165-5-13-14]. She never met Mr. Christie, and did not attempt to get any medical information from him. Instead, she passed the information regarding the refusal on to Canete, who replaced her at the end of her shift [D.E. 165-5-15-16, 26]. In the meantime and based on the refusal, Mr. Christie was moved to a "D cell" in the booking area of the Jail [D.E.165-5-18].

Canete was one of three nurses working the day shift in the Jail March 27 to 29, 2009, and has been a registered nurse for 46 years [D.E.165-6-7, 17]. Her first interaction with Mr. Christie was between 7 and 7:30 a.m., Saturday March 28, when a corrections officer informed her Mr. Christie was refusing to go to first appearance in court. After a brief discussion, Mr. Christie agreed to go to court [D.E. 165-6- 20-22]. Canete also cleared Mr. Christie after the use of pepper spray at about 6:40 p.m. [D.E. 165-6-37].

In the morning of March 29th, Canete saw Mr. Christie, and at that time, he was in the restraint chair. Again, Mr. Christie was not in distress and appeared to be stable [D.E. 165-6-37-38]. She was unaware of any medical problems, and if she was aware he was diagnosed with COPD and atrial fibrillation, she would have moved him to the medical unit [D.E. 165-6-45-47, 69]. In the early afternoon, Canete again assessed Mr. Christie, found his breathing to be worse, arranged for him to be moved to the medical floor, and he was provided oxygen [D.E. 165-6-50, 73-74]. At 2 p.m., the decision was made to transfer Mr. Christie to the hospital. Canete contacted the on-call physician assistant, Jones, and obtained permission to send him to the

hospital. He was transported at about 2:30 p.m. [D.E.165-6-74-75, 82-83].

Sundo is a licensed practical nurse, a career spanning 40 years, 11 of those in the Jail [D.E.165-7-4-5]. She first came in contact with Mr. Christie on Saturday March 28, when she cleared Mr. Christie following the use of pepper spray. Other than what appears in the medical records, she does not remember this event [D.E. 165-7, 13-15].

At about 6:50 a.m. on the 29th, while Mr. Christie was in the mental health unit, Sundo again cleared Mr. Christie from the use of pepper spray. In performing this task, her primary goal is to ensure the patient is breathing properly, as it is usually impossible to get close enough to take vital signs, so security officers do not allow close contact. At this time, she found Mr. Christie to be agitated and yelling and screaming, and she was able to determine that his ability to breathe was sufficient [D.E.165-7-9-10, 12, 17-25].

At 11:47 a.m., Sundo assessed Mr. Christie while he was restrained. In so doing, she made sure the restraints were not too tight at the wrists and ankles, and checked his breathing status, which was normal, and she did not see a need to obtain any other vital signs [D.E. 165-7-39-43, 53].

Later, she assisted nurse Winnie in moving Mr. Christie to the medical unit. She testified that a wheelchair was brought to the mental health unit, and Winnie arranged for Mr. Christie to get a shower to remove the pepper spray. Afterwards, both Sundo and Winnie determined that he should go to the hospital, and Canete was contacted for approval [D.E. 165-7-50-54].

Winne is a licensed practical nurse, working in the Jail for nearly eight years [D.E. 165-8-6]. She did not have any contact with Mr. Christie until 8:47 a.m. on Sunday March 29, as she was assigned to the medical unit and Mr. Christie was in the mental health unit. Sundo was assigned to the mental health unit, and asked Winnie to see Mr. Christie following the use of

pepper spray [D.E.165-8-19-23, 29, 31, 38].

When Winnie arrived in the mental health unit, Mr. Christie was in a cell with another individual, and both were in restraint chairs. The other individual was quiet, but Mr. Christie was saying that he wanted to go home. Her interaction at this time is noted both in the Restraint Flow Sheet and the progress notes [D.E. 165-8-24]. Security officers did not allow Winnie to get in the cell with Mr. Christie, so she could not take any vital signs, and while Mr. Christie did not make any comments directly to her, she heard him swearing and calling the corrections officers names [D.E. 165-8-32-33, 35, 69]. She was concerned about the amount of pepper spray being used, and passed her concerns on to Canete [D.E. 165-8-37-38, 69-70].

At 9:47 a.m., Winnie noted that Mr. Christie had labored breathing, a condition usual after the use of pepper spray, and she contacted a corrections sergeant to arrange for a shower to clean the pepper spray from his body. After this was done by corrections officers, Winnie told the corrections officers to call her if Mr. Christie had any difficulties [D.E. 165-8-44-46, 48-49, 67-69]. When she checked on him at 10:47, she noted that his respirations were better [D.E. 165-8-50-51].

At about noon, Mrs. Christie arrived at the Jail, and Winnie spoke to her in the Jail lobby. Mrs. Christie was angry, and told Winnie that she wanted her husband sent to a mental health facility. Although Mrs. Christie had her husband's medical records with her, and although Winnie told her this information was needed, Mrs. Christie would not allow Winnie to make a copy of the documents, and she was not able to read the documents [D.E. 165-8-50-55].

Mrs. Christie said she was concerned with her husband's mental status, not his medical condition. Winnie convinced her to discuss the situation with someone from mental health, and got Mrs. Christie's phone number. She gave that number to Stepnowski, the mental health

supervisor, along with a request that she try to gain Mrs. Christie's cooperation [D.E. 165-8-55-57, 66-67].

Winnie saw Mr. Christie at sometime before 12:47 p.m., to check on the restraints. Mr. Christie was once again having labored breathing, and she asked Canete to bring the oxygen tank. Mr. Christie was removed from the cell and taken to the medical unit for further evaluation. After further evaluation, Canete and Winnie agreed Mr. Christie should go to the hospital [D.E. 165-8-57-60, 63-64].

Stepnoski is the mental health supervisor in the Jail, but had no interaction with Mr. Christie. In March 2009, the mental health department included a psychiatrist, a mental health registered nurse, a clinical social worker and Stepnoski. The psychiatrist was on call whenever he was not in the Jail, as was Stepnoski [D.E.165-9-10-11, 14-15, 18, 20, 65].

On the morning of Sunday March 29, Stepnoski received a call from Canete, asking her to come to the main jail to evaluate patients newly admitted to the mental health unit, where Christie was housed. Canete told her she was concerned because there were many inmates in the unit. Stepnoski usually evaluated patients in both the main jail and the CORE facility on Sundays, but was required to go to the Core facility first, as an inmate needed to be involuntarily committed before she was released from the Jail, and this process usually took several hours. Mr. Christie was not specifically discussed in this call. When Stepnoski arrived at the mental health unit, medical staff was preparing to send him to the hospital, so she could not evaluate him [D.E. 165-9-64-72, 83].

## II. Argument

### A. Summary Judgment Standard

The Court should grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986) (emphasis in original).

Once a party demonstrates the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The evidence must be significantly probative to support the claims, *See Anderson*, 477 U.S. at 248–49 (1986), and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed.R.Civ.P. 56(e)(3). Therefore, the non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." *Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir.1990). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker*, 911 F.2d at 1577. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or

unnecessary will not be counted." *Anderson* at 248.

**B. <u>Section 1983--PHS</u>**

When bringing a federal civil rights claim against a corporation such as PHS, liability only attaches if an official unconstitutional policy or custom of the corporation causes the alleged deprivation of constitutional rights. *See Monell v.Department of Social Serv.*, 436 U.S. 658, 691 (1978); *Marsh v. Butler County*, 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc ) (stating that a county is "liable under section 1983 only for acts for which the county is actually responsible"); *Buckner v. Toro*, 116 F.3d 450 (11th Cir. 1997) (extending the application of *Monell* to private corporations performing traditional public functions); *Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992)(collecting cases). Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the [corporation]." *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986). "A policy is a decision that is officially adopted by the [corporation], or created by an official of such rank that he or she could be said to be acting on behalf of the [corporation]. . . . A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). To establish a policy or custom, it is generally necessary to show a persistent and widespread practice.

However, a plaintiff must do more than merely identify a policy—there must be proof the policy was created with "deliberate indifference to its known or obvious consequences." *Davis v. DeKalb County Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000); *Monell v. New York Dept. of Soc. Serv.*, 436 U.S. 658 (1978). That is, " 'municipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." *Brown* at 388 (quoting *Pembaur v. Cincinnati*, 475

U.S. 469, 683-84 (1986) (Brennan, J., plurality)).

The *Brown* Court also narrowed the test for liability when it stated:

> [I]t is not enough for a § 1983 plaintiff to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Brown*, 520 U.S. at 404. A plaintiff's burden is heavy, and the Eleventh Circuit described both the required showing and the reason for the heightened showing:

> This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983. As the Supreme Court has explained, '[t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident.

*Gold v. City of Miami*, 151 F.3d 1346, 1351 n. 10 (11th Cir. 1998); *see also Brown* at 415-16 (stating that "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability").

The Eleventh Circuit reviewed the necessary showing in *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004). There, the plaintiff brought section 1983 claims against a Georgia county, claiming policies constituted and resulted in deliberate indifference to his medical needs. Specifically, the plaintiff claimed a policy of understaffing officers to transport inmates to the hospital caused a delay in his transport to the hospital.

In *McDowell*, an inmate was seen and treated for back pain at a local hospital on June 5, 1997. At 9:30 the next night, he reported an inability to urinate and difficulty walking, and medical personnel in the employ of a private medical contractor decided to send him back to the

hospital. But transporting officers could only take one inmate at a time, and another inmate with trauma was transported first. The next morning, McDowell's transport was bumped several times by mental health inmates, as his condition was not considered an emergency and mental health transports were given priority by policy. Later, McDowell reported that he had no feeling in his legs; was examined by a physician; his condition deemed emergent; and he was taken to the hospital by ambulance, arriving at 12:20 p.m. At the hospital, a spinal abscess was diagnosed, and surgery was performed. After surgery, McDowell was an incomplete paraplegic. *See McDowell at 1286-87*.

*McDowell* arrived at the 11th Circuit after the district court granted summary judgment to the county. The court noted the long-standing rule that municipalities cannot be vicariously liable in section 1983 cases, and a plaintiff must show a custom or policy constituted deliberate indifference, and the custom or policy caused a constitutional violation. *Id.* at 1289 (citing *Monell*, 436 U.S. at 692).

"This threshold identification of a custom or policy 'ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.' " *McDowell*, 392 F.3d at 1290 (quoting *Bd. of County Com'rs v. Brown*, 520 U.S. 397, 403-04 (1997)). Such an identification "prevents the imposition of liability based upon an isolated incident." *Id*. "Rather, the incident must result from a demonstrated practice." *Id*. The Eleventh Circuit concluded that "based on these instructions, McDowell must establish that the county's policy was to understaff the field division, and that this practice left the division unable to execute medical transports." *Id.*

The court noted McDowell could not "point to another occasion when the Jail's understaffing, and resulting inability to transport, contributed to or exacerbated an inmate's medical condition." *Id*. Therefore, the court determined this occurrence was an "isolated incident" rather than a "persistent" or "widespread" policy. *Id*. at 1290-91.

Next, the *McDowell* court analyzed whether the "municipality's action was 'taken with the requisite degree of culpability . . . with deliberate indifference to its known or obvious consequences.' " *Id.* at 1291 (citing *Davis ex rel. Doe v. Dekalb County Sch. Dist*., 233 F.3d 1367, 1375-76 (11th Cir. 2000)). The court found that McDowell could not rely on a "generalized policy of understaffing, and a resultant inability to transport." Instead, he had to show the county had a "deliberate intent" to inadequately staff the jail. *Id.*

Relying on the Supreme Court's decision in *Brown*, the *McDowell* court found that in a case "where the plaintiff claims that a municipality's facially valid actions violated his constitutional rights . . . , 'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.' " *Id.* (quoting *Brown*, 520 U.S. at 405). "Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Brown*, 520 U.S. at 415, 117 S.Ct. 1382 (emphasis in original). For municipal action "to meet this burden, a plaintiff must demonstrate that the lawful action was 'taken with deliberate indifference as to its known or obvious consequences.' " *McDowell*, 392 F.3d at 1291 (quoting *Brown*, 520 U.S. at 407). A "showing of simple or even heightened negligence is not enough." *Id.* (citing Brown at 407).

Applying these rules, the Eleventh Circuit found McDowell's argument without merit. *McDowell*, 392 F.3d at 1292. The court determined there was no evidence the governing body

knew of any potential medical concerns caused by its decision, and found the policy to be sound. *Id.* (stating that the policy to transport inmates or call an ambulance was a "clear, simple directive that said if you cannot transport with your resources you are to call an ambulance for needed medical transportation"). The court found McDowell could not establish "that the Board would anticipate that inmates would not receive timely medical attention." *Id.* at 1292. Thus, the court found that the alleged constitutional violation was not a "highly predictable consequence" of the county's failure to budget and staff the jail. *Id*.

The court then considered causation. The county's "deliberate conduct" had to be the "moving force" behind McDowell's injury. *Id.* The court recognized the Supreme Court's caveat in *Brown* that "[t]o prevent municipal liability for a . . . decision from collapsing into respondeat superior liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id*. (quoting *Brown*, 520 U.S. at 410). To "test the link" between the injury and the County's conduct, the *McDowell* court looked "to whether a complete review of the budget decision (and the resulting understaffed Jail) reveals that the Board should have known that the injuries were a 'plainly obvious consequence' of that decision." *Id.* (stating that "[w]hile it may be true that the Board's budget decision would make a violation of his constitutional rights 'more likely," that alone cannot 'give rise to an inference that a policymaker's failure to scrutinize the [budget]. . . produced a specific constitutional allegation)(quoting *Brown* at 411). Again, relying on *Brown*, the court went on to state that "liability must be premised on a finding that "*this*" budget decision was 'highly likely to inflict the *particular* injury' McDowell suffered." *Id*. at 1292 (quoting *Brown* at 411) (emphasis in original). The *McDowell* court stated:

> McDowell did not proffer testimony that members of field division believed they could not perform medical transports because of understaffing. Additionally, McDowell did not

> demonstrate that the County was the moving force behind his injury, given that the Jail was instructed to request an ambulance to transport medical cases to Grady when the field division was unavailable. Finally, the record indicates that the consequences associated with the Jail's failure to transport McDowell to the hospital in a timely fashion never happened before. To hold a municipality liable for any conceivable constitutional violation, whether based on past concrete injury or mere speculation, would erode its ability to manage and govern.

*Id*. at 1292-93.

Application of the rules from *Brown* and the reasoning of *McDowell* to this record shows the claim is not supported. The Complaint identifies the relevant policies only in the most general terms. Nothing in the record shows there was a policy to deny intake medical and mental health screenings; fail to provide medications or that any policies were made with deliberate indifference to medical or mental health needs. Instead, the record includes evidence that policies were in place for each of these inmate needs. As in *McDowell,* the policies are not facially unconstitutional, as they would be there if were no policies covering these functions. Because the policies are facially valid, there must be a showing the policies were created "with deliberate indifference to its known or obvious consequences." According to *Brown* and *McDowell,* this requires proof PHS had a "deliberate intent" in making policies to deny inmate care.

As did the plaintiff in *McDowell*, the record must show the alleged deliberately indifferent policies "contributed to or exacerbated any other inmates' medical condition." *McDowell*, 392 F.3d at 1290. Nothing in this record shows any inmate was previously harmed by a failure to perform an intake screening where the inmate refused to cooperate by providing a medical or mental health history. The record does not reveal a "pattern of injuries" linked to the policies. Indeed, the record is devoid of any evidence PHS was aware any of its policies were flawed, and the record is without any showing any other inmate suffered a constitutional injury due to these policies.

There is also no record support for the claim that Mr. Christie's injury was caused by any PHS policy, which requires proof of a "direct causal link" and that the policy was the "moving force" behind a constitutional injury. To do so, the Plaintiff must show that PHS knew Mr. Christie's injuries were a "plainly obvious consequence" of the decision to create the policies. Finally, the Plaintiff must show the decision to create the policy was "highly likely to inflict the *particular* injury."

None of the required evidence is in this record. Policies are in place to obtain a history from inmates coming in to the Jail. Policies were in place to provide medications. At most, the record supports a claim some nurses failed to follow those policies. However, the failure to follow otherwise constitutional policies cannot result in constitutional liability for PHS.

### C. **Section 1983—Individual Medical Defendants**

The Fourteenth Amendment prohibits state officials from acting with deliberate indifference to the serious medical needs of pretrial detainees. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009); *Hamm v. DeKalb County*., 774 F.2d 1567, 1572 (11th Cir. 1985). To prevail, a plaintiff must present evidence of an objectively serious medical need, and subjective evidence that the individual actors intentionally disregarded that need. *See Farmer v. Brennan,* 511 U.S. 825, 833-38 (1994); *Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1191 n.28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law). While due process prohibits jail officials from exhibiting deliberate indifference to prisoners' serious medical needs, the Supreme Court has stated that "a complaint that a physician has been negligent in diagnosing

or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle* at 106; *see Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995).

A serious medical need is one that has been diagnosed by a physician as needing treatment or one for which even a layperson would recognize the need for a doctor's care. *See Burnette v. Taylor, 533* F.3d 1325, 1330 (11th Cir.2008). However, that an individual has a serious medical need is only part of the calculus. A successful plaintiff must also show the individual subjectively knew of a risk of serious harm and yet intentionally disregarded that risk. *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). For an official to subjectively know of a risk of serious harm, the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Thus, to defeat summary judgment, the record must contain evidence that an official subjectively knew about the plaintiff's serious medical condition. *McElligott*, 182 F.3d at 1255. "Proof that the defendant should have perceived the risk, but did not, is insufficient." *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citation omitted).

While an individual may be liable on a constitutional theory, "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citations omitted). "The standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous." *Cottone v. Jenne*, 326 F.3d 1352, 1361 (11th Cir. 2003). "Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged

constitutional deprivation." *Hartley*, 193 F.3d at 1269 (internal quotation marks and citations omitted).

Mr. Christie was not ignored by the individual Medical Defendants. During his second detention, they attempted to get a medical history from Mr. Christie, but he refused to give that history. With that refusal, Saunders attempted to locate the history from the previous detention, but was unsuccessful. With each application of pepper spray, they assessed his condition to the best of their ability, and found him to be in no distress. When they became concerned for his wellbeing, arrangements were made with corrections officers to remove the pepper spray, and he was moved to the medical unit. After he was assessed, it was determined that he required hospitalization, and he was sent to the hospital.

At most, the record shows the individual Medical Defendants could have done more, and they concede for purposes of this Motion that issues of fact remain on some of the negligence claims. However, this showing is insufficient to maintain the civil rights claims against the individuals, especially since Mr. Christie was provided care, as courts are extremely hesitant to find a constitutional violation because it is assumed the medical professional provided care based on his or her medical judgment. *See Hamm v. DeKalb County*, 774 F.2d 1567 (11th Cir.), cert. denied, 475 U.S. 1096 (1986); *Payne v. Corrections Corp. of America*, 194 F.3d 1313 (6th Cir. 1999); *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977) (stating that courts will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment"); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir.1976) (stating that "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law").

### D. State and Federal Claims—Jones, Stepnoski, Overbee and Hollier.

Aside from the foregoing, Jones, Stepnoski, Overbee and Hollier are entitled to summary judgment on both the civil rights and negligence claims. Jones' only interaction with this case was in authorizing Mr. Christie's transfer to the hospital. Stepnoski and Overbee had no interaction with Mr. Christie. Finally, Hollier's only interaction was to countersign Aten's signature on the refusal of treatment form. At best, these interactions were tangential, and had no legal impact on the care provided Mr. Christie.

## III. Conclusion

For the foregoing reasons, summary judgment should be entered in favor of the Medical Defendants.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of June 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System which will send the foregoing to: Virginia M. Buchanan, Esq., Levin Papantonio Thomas Mitchell Echsner Rafferty & Proctor, P.A., 316 South Baylen Street, Suite 600, Pensacola, FL 32502; Nicholas DiCello, Esq., William Hawal, Esq., Spangenberg, Shibley & Liber, LLP, 1001 Lakeside Avenue East, Suite 1700, Cleveland, OH 44114; and to Summer Barranco, Esq., Richard Giuffreda, Esq., Purdy, Jolly, Giuffreda & Barranco, P.A., 2455 East Sunrise Blvd., #1216, Fort Lauderdale, FL 33304.

BUNNELL & WOULFE P.A.
1625 Hendry Street, Suite 203
Fort Myers, FL 33901
Phone: 239.337-1630
Fax: 239.337-0307
gat@bunnellwoulfe.com

By: /s Gregg A. Toomey
Gregg A. Toomey
Florida Bar No. 159689