UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JOYCE CHRISTIE, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE AND NEXT OF KIN OF NICHOLAS T. CHRISTIE, DECEASED,

**Case No. 2:10-cv-420-FtM-36DNF**

Plaintiff,

**DISPOSITIVE MOTION**

v.

MIKE SCOTT, Lee County Sheriff; PRISON HEALTH SERVICES, INC., a Tennessee Corporation; DEPUTY DANIEL FALZONE; DEPUTY KURTIS CALHOUN; DEPUTY DATHAN S. PYLE; DEPUTY JEREMY HARDIN; DEPUTY ANDRE DIMARCO; SERGEANT ARMANDO CROKER; SERGEANT MARY DAROSS; SERGEANT ROBERT BRAMBLET; LIEUTENANT MICHAEL PEAK; MARIA CANETE, R.N.; LINDA SUNDO, L.P.N.; NATALIA SAUNDERS, R.N.; JOAN WINNIE, R.N.; GERALDINE JONES, R.N.; JANICE STEPNOSKI, L.C.S.W.; KAREN OVERBEE, CHRISTINE ATEN; TAMMY HAMILTON, R.N.; KATHRYN T. HOLLIER, C.N.A.,

Defendants.
______________________________________________/

**DEFENDANT SHERIFF MIKE SCOTT'S MOTION FOR SUMMARY JUDGMENT (AND MEMORANDUM OF LAW)**

COMES NOW the Defendant MIKE SCOTT in his official capacity as Sheriff of Lee County, Florida, by and through undersigned counsel, hereby files this his Motion for Summary Judgment (and Memorandum of Law), pursuant to Rule 56 of the Federal Rules of Civil Procedure, and as grounds therefore would state as follows:

1. This matter is proceeding upon the Plaintiff's Fourth Amended Complaint and

Demand for Jury Trial. [DE 113]. The Plaintiff's Fourth Amended Complaint contains three claims which are brought pursuant to 42 U.S.C. §1983 against Lee County Sheriff Mike Scott in his official capacity. Plaintiff's Third, Fourth and Fifth claims represent the Plaintiff's Monell claims.[1] These claims allege that the Sheriff had a custom policy practice or procedure that caused Nicholas Christie's constitutional rights to be violated as the result of the use of excessive force and through a deliberate indifference to Christie's serious medical and mental health needs. The Plaintiff's Eighth claim is a state law assault and battery claim against the Sheriff regarding the alleged conduct of Co-Defendants Falzone, Calhoun, Pyle, Hardin and DaRoss. The Plaintiff's Ninth and Tenth claims are state law claims against the Sheriff alleging negligent hiring, retention and supervision.

2. The Defendant Sheriff Mike Scott filed an Answer and Defenses denying the Plaintiff's material allegations, including the claims that his customs and policies directly caused a violation of Nicolas Christie's constitutional rights and that the Sheriff is liable pursuant to state law as alleged. [DE 115].

WHEREFORE, based upon the pleadings in the file, the record evidence, and the exhibits attached hereto, the undisputed material facts establish that the Defendant Scott, in his official capacity, is entitled to summary judgment on the Plaintiff's Third, Fourth, Fifth, Eighth, Ninth and Tenth claims [DE 113].[2]

---

[1] 436 U.S. 658 (1978).

[2] The Plaintiff's First, Second, Seventh and Eleventh claims pertain to various Co-Defendants. Plaintiff's Sixth claim was dismissed by the Court. [DE 106-108].

Further, and in support of this motion, the Defendant Scott would refer this Honorable Court to the statement of facts and memorandum of law incorporated herein.

**STATEMENT OF FACTS**[3]

Deputy sheriffs who are employed as corrections officers, and working in the Lee County jail (LCJ) facility operated by Sheriff Scott including Falzone, Calhoun, Pyle, Hardin, DiMarco, Croker, DaRoss, Bramblet, Gibbs, Hansen, and Eldridge, met all of the requirements in accordance with Florida Statute Chapter 943 (2009) and the requirements as established by the Criminal Justice Standards and Training Commission/Florida Department of Law Enforcement (C.J.S.T.C./F.D.L.E.) to be corrections officers in the State of Florida, including the time period of Nicholas T. Christie's incarceration. Former Lt. Michael Peak, who had no contact with Christie, was a sworn certified law enforcement officer in compliance with Chapter 943 Florida Statutes (2009). (See Exh. "A" Ellegood aff.). Records of completion and satisfaction of these requirements are maintained by the Lee County Sheriff's Office (LCSO) in each employee's personnel and training files. LCSO provides in-service training to all sworn certified corrections and law enforcement officers in an amount that exceeds the requirements of Florida Statute Chapter 943.135 (2009) and as established by the C.J.S.T.C. (Id). The topics covered vary, depending upon the needs at the time, and are in full compliance with the requirements of the C.J.S.T.C./F.D.L.E. In addition, deputies, including Falzone, Calhoun, Pyle, Hardin, DiMarco, Croker, DaRoss, Bramblet, Peak, Gibbs, Hansen, and Eldridge, were

[3] See the Medical Defendants' Motion for Summary Judgment regarding Nicholas Christie's medical care. [DE 165, 166]. See the Co-Defendant Deputies' Motion for Summary Judgment regarding the facts which relate to the use of force upon Christie.

trained in, and were certified in, the use of O.C./pepper spray at the time of Christie's incarceration. (Id). Deputies are taught that the use of O.C. is to be used only for the purpose of maintaining security and the orderly operation of the corrections facility. In this context, deputies are taught that they are not authorized to punish or maliciously harm an inmate. (See id).

The Sheriff of Lee County, Florida, does not have a policy, custom, pattern or practice of causing deputy sheriffs employed as corrections officers to apply force maliciously and sadistically for the very purposes of causing harm and/or to be deliberately indifferent to a known serious medical or mental health need of an inmate. If the administration determines that a deputy sheriff has applied force maliciously and sadistically for the very purpose of causing harm, and/or has been deliberately indifferent to a known serious medical or mental health need of an inmate, that deputy sheriff may be subject to administrative sanctions including, but not limited to, termination. (See Exh "A").

Furthermore, during the time period within which Nicholas Christie was incarcerated in the LCJ, the Sheriff contracted with Prison Health Services, Inc. (Corizon) to provide medical care and treatment to inmates in a competent, professional and lawful manner as the Sheriff and corrections officers are not licensed medical care providers. (See Exh. "A"). Pursuant to policy and the Florida Model Jail Standards, a member of the medical staff is required to perform a medical evaluation screening on all inmates. Florida Model Jail Standards, Chapter 4, Admissions, Classification and Release (4.02) indicates that medical screening shall occur during the admissions and booking process unless the inmate is belligerent and unruly to the

point of being unmanageable. Corrections officers rely upon the contracted medical care provider staff to inform them of any medical condition that impacts a correction officer's decision to use force upon an inmate. (Id). Otherwise, an inmate's medical condition is considered to be protected under patient privacy laws and is generally not known to corrections officers. (Id). A true and correct copy of the contract between the LCSO and the jail medical care provider (PHS) which was in effect at the time of Christie's confinement in the LCJ is attached to Exh. "A" as Exh. "1".[4]

The Lee County Bureau of Corrections processed the following total number of inmates during the following years:

| | | | |
|---|---|---|---|
| 2006: | 35,833 | 2009: | 33,795 |
| 2007: | 39,106 | 2010: | 32,180 |
| 2008: | 39,135 | 2011: | 30,133 |

(See Exh. "A"). Nicholas Christie was incarcerated in the LCJ on two separate occasions in 2009. Those time periods are March 25-26, 2009 and again between March 27-29, 2009. (See DE 113, ¶35).

There is no evidence of a single prior instance where a Lee County inmate died as the result of the application of O.C./pepper spray or as the result of being placed in a restraint chair as alleged in this case. When used in accordance with policy, O.C./pepper spray and the restraint chair are considered a minimal amount of force to be used to avoid a hands on physical

[4] See Exh. "A", Exh. "1" contract Article: I. "The Sheriff hereby contracts with PHS to provide for the delivery of reasonably necessary medical, dental, mental health and substance abuse care to individuals under the custody and control of the Sheriff and incarcerated in the Jail." The decision to contract evidences that the Sheriff was not deliberately indifferent to inmates' serious medical needs.

altercation with an inmate, which is more likely to result in injury to the inmate and staff. (See Exh “2”to Exh. “A").

Furthermore, the Sheriff of Lee County had certain official written policies which were in effect at the time of Nicholas Christie’s incarcerations in the LCJ in March of 2009 which related to the treatment of inmates housed in the LCJ, and which govern the actions of all corrections officers. True and correct copies of those policies are attached to Exhibit “A” as Exhibit “2" and are reproduced, in part, herein infra. [5]

True and correct copies of the Response to Resistance packets (Incident #s 1504, 1506, 1509, 1514, 1524 and 1515) which concerned Nicholas Christie during his confinement in the LCJ in March of 2009, are attached to Exh. “A” as Exh “3”. These are the final versions of the forms after any corrections were made to accurately reflect the incident and the personnel involved, as well as after the packets were reviewed and signed off by the applicable chain of command. (See Exh.“A”, ¶10).

The Incident numbers used to identify Response to Resistance packets, as noted above, are assigned by the LCJ computer system when a supervisor opens a new supervisory report, which is the Response to Resistance cover sheet, in regard to the review of the use of force incident as documented by a deputy. As a result, the incident numbers may not always be in chronological order in relation to when the incident actually occurred. (See Exh “A”, ¶11.)

Incident # 1504 occurred in cell 1D-3 while Incident #1506 occurred in cell 1D-4. These

---

[5] Nicholas Christie was lawfully arrested and incarcerated. There are no false arrest claims in this case. [DE 113].

cells are air conditioned holding cells with solid doors with a small window and food pass. Located within each of these cells are sinks with running water as well as a toilet. The cell dimensions for these cells are 7' 4" wide, 11' 7" deep and 8' 2" high. Incident #'s 1509,1514,1524 and 1515 occurred in cell 3A-3. This cell is an air conditioned direct observation housing cell where a deputy is stationed inside of the day room located at a desk in close proximity to the inmates. 3A-3 has a sink with running water and a toilet. The cell dimensions are 7' 4" wide, 12' 7" deep and 8' 2" high. 3A-3 has a barred door which opens to a much larger triangular shaped day room area (45' 1" at its widest point and 28' 1" deep at its deepest point. The day room has a 12' high ceiling.) All cell blocks within the LCJ, including 1D-3, 1D-4 and 3A-3, have adequate air flow and ventilation in compliance with the Florida Model Jail Standards.[6]

Exhibits "4" and "5" to Exhibit "A" are true and correct copies of Nicholas Christie's arrest and jail records. Christie was lawfully arrested and incarcerated on March 25, 2009 and again on March 27, 2009 after pleading no contest in his first criminal case and receiving a sentence of time served, resulting in his release on March 26, 2009.

LCSO use of force and restraint device policies in effect during Nicholas Christie's incarceration read in pertinent part as follows: [7]

"S.O.P. 6.11 USE OF FORCE.

---

[6]On March 28, 2009, Nurse Canete completed a medical/mental health housing recommendation form seeking to transfer Christie to a direct observation unit for mental health reasons. Unit 3A was a direct observation unit in March of 2009. (See Exh "B").

[7]See Exh. "A", Exh. "2" attached thereto.

I. POLICY: It is the policy of the Lee County Sheriff's Office Corrections Bureau, to handle non-compliant subjects using non-lethal force. Use of force will be restricted to instances of justifiable self-defense, protection of others, protection of property, the prevention of escapes, and when an inmate exercises resistance to a lawful command. In no event will physical force be justifiable as punishment. A written report will be prepared following all uses of force and will be submitted to the Facility Commander via the chain of command.

II. PROCEDURE:

A. GENERAL:

1. No person will enter a Corrections facility with firearms, ammunition, chemical agents, or electronic weapons except in emergencies, and then only when authorized by the Sheriff or designee. The chemical agent oleoresin capsicum, E.R.D. or other such suitable agents are authorized to be carried inside the Corrections facility by certified Corrections Officers trained in its use. Weapons will be stored in weapon depositories located near the secure entrance of the facility or secured in vehicles out of sight.
2. The use of force may be applied to the person of an inmate only to the degree which is reasonably necessary in justifiable self-defense, the protection of others, the protection of property, the prevention of escapes, or when an inmate exercises resistance to a lawful command.
3. The use of force will be used only when necessary to control inmates and after verbal persuasion, warning, and the show of force have been used or considered inappropriate. It will not be used as punishment.
4. Restraints will not be placed on an inmate in such a manner as to cause injury or remain on the inmate longer than necessary.
5. Personnel will use the appropriate amount of force necessary to quell a situation or actions of an inmate(s). They will immediately notify the supervisor on duty and later will be required to justify their actions.
6. No force will be used beyond the point as to gain or regain control of the inmate or situation and the force will de-escalate with the de-escalation of the actions of the inmate.
7. Though the best course of action would be to follow the use-of-force order listed previously, some situations may warrant the use of the Electronic Restraining Device (E.R.D.) before the use of OC Spray or may warrant the use of physical force before the use of the E.R.D. depending on the aggressive actions of the inmate and for the personal protection of officers and others. No force will be used beyond the point as to gain control of the inmate or situation and the force will de-escalate

with the de-escalation of the force brought against an officer by an inmate.

...

B. FORCE CONTINUUM:

1. FORCE CONTINUUM LEVEL I
The presence of a Corrections Deputy can sometimes be enough to quell a disturbance or prevent an incident from occurring or escalating.

2. FORCE CONTINUUM LEVEL II
(Verbal Force, Persuasion, Listening Skills)
The second level of the continuum, when practical, should be a verbal attempt to rectify the situation encountered. The officer should attempt to use effective verbal skills and give clear direction to the inmate. Good listening skills should be used as well as attempt to determine what is causing the disturbance. Try to establish if the inmate has a legitimate problem or see if the inmate comprehends your directions.

3. FORCE CONTINUUM LEVEL III
(Show of Force, Chemical Agents and/or E.R.D. Displayed)
If verbal direction fails or is not practical and the inmate continues to exhibit passive resistance for the situation, the officer can then go to the next level of the continuum. Through the direction of the supervisor, officers will be sent to the area of the disturbance to establish a show of force. The chemical agent or E.R.D. will be displayed and the inmate will be clearly warned. If time permits, officers are to contact the medical unit to determine if the inmate has any medical condition which should be considered before proceeding to the next level of the Force Continuum.

4. FORCE CONTINUUM LEVEL IV
(Chemical Agents)
Continued non-compliance either by passive actions will justify the use of the chemical agent. The implementation of chemical agents may lessen the chance of Officer and inmate injury when used by trained personnel compared to “hands on”, physical contact with an inmate. Any time a chemical agent is utilized a “Response to Resistance Report” will be generated to document the use in detail. This report will be submitted through the proper chain of command.

...

C. CHEMICAL AGENT USE:
(Fogger, Stream, Foam)

It is the policy of the Lee County Corrections Bureau to employ chemical agents when verbal intervention has failed. The option to deploy chemical agents by a Corrections Officer is the next step in the use of force continuum after verbal commands and a show of force has been unsuccessful. Containment and control with strong emphasis on humane treatment of the subject(s) is afforded by the use of a chemical agent.

1. Criteria for Use:
   - (a) Prevent serious injury or loss of life
   - (b) Prevent or suppress riots or disturbances
   - (c) Prevent willful destruction of property
   - (d) Prevent an inmate from completing a suicide attempt
   - (e) Prevent an escape from custody
   - (f) When an inmate exercises resistance to a lawful command

2. General Rules of Use for Chemical Agents:
   - (a) Only personnel trained in the use of chemical agents are authorized to deploy it.
   - (b) All chemical agents that are not personal issue will be stored in a secured area and must be accounted for by each shift. Chemical agents may be secured in an Officer station at the Supervisor’s direction. The Direct-Observation Officer will always have chemical agents on his/her person and will utilize them to prevent a suicide attempt or attempt to injure self.
   - (c) Any time a chemical agent is used a “Response to Resistance Report” will be generated to document the use of the chemical agent.
   - (d) Any time the chemical agent is utilized, medical personnel, if on duty, will evaluate the individual(s) and provide treatment if required. If medical personnel are not present, the supervisor will have the individual(s) afflicted checked by medical personnel (E.M.S.) for possible treatment.

3. Chemical Agent Procedural Application:
   - (a) The chemical agent will be used by pointing the nozzle towards the inmate. The chemical agent will be ejected by pressing the thumb on the nozzle producing approximately 2-one second bursts to the facial area. Additional bursts may be applied until the desired effect results (i.e. compliance).
   - (b) The Officer will advise the inmate after the spraying the proper decontamination procedures. They may include but are not limited to:

(1) Remain calm
(2) Control breathing
(3) Flush affected area with water
(4) If applicable, move inmate to a non-contaminated area.

**...**

E. **Notification Responsibilities for a Use of Force:**
If there is a use of force, the highest ranking Supervisor on the shift will be notified after initiating any action. **Only in an extreme emergency will the Supervisor on the scene become involved physically in the use of force.**

**...**

G. **Medical Attention:**

1. Any personnel who are injured or believe they may be injured as a result of an incident or use of force will immediately notify the Supervisor.
2. Proper medical attention will immediately be given to any individual in need whether performed by contracted medical staff or an outside provider.

H. **Training:**
Only personnel who have successfully competed the Use-of-Force training requirements and have successfully been trained in the use of chemical agents and the E.R.D. may utilize the chemical agents and E.R.D. This training will include the treatment needed for exposed individuals.

**...**

**IN ALL DEALINGS WITH INMATES, ALWAYS TREAT THEM IN A FAIR AND HUMANE MANNER.**"

"S.O.P. 6.06 RESTRAINT DEVICES

**I. POLICY:** It is the policy of the Lee County Sheriff's Office Corrections Bureau to use restraint devices on inmates only when other means of control have been ineffective. Restraints will not be placed on an inmate in such a manner as to cause injury or remain on the inmate longer than necessary. Instruments of restraint will never be applied to the person of an inmate as punishment.

**II. PROCEDURE: RESTRAINING DEVICES**

A. GENERAL: Use of restraining devices are based on the inmates actions. The minimum restraint devices for the actions of the inmate will always be used:

1. Who pose a threat of escape?

2. Who pose an immediate danger or threat to staff or other inmates?
3. Who are involved in or inciting a disturbance?
4. Whose actions, if allowed to continue will result in property damage?
5. Who are exercising resistance to a lawful command?
6. Who are in transit?
7. An inmate will not be placed in restraints and left or placed in a cell, day room or common area where there are unrestrained inmates.
8. If an inmate is left restrained for a reasonable period of time, the Shift Supervisor or designee will physically check the inmate's status every fifteen (15) minutes.

**...**

## III. PROCEDURE: RESTRAINT CHAIR

A. DETERMINATION FOR RESTRAINT CHAIR USE: When an inmate is considered to be self-destructive as demonstrated by their actions, the on-duty Shift Supervisor must make a determination as to whether or not to place an inmate in a restraint chair. There is no formula that can be applied towards establishing a specific time criterion for the use of restraint chair. This decision is reached by using a common sense approach towards protecting the inmate from self harm or are at risk for harming others. Actions that may prompt the Shift Supervisor to use the restraint chair include but not limited to; actual suicide attempts, acts of self-mutilation or continued violent resistance while in restraint devices.

B. AUTHORIZATION AND NOTIFICATION:

1. Inmates whose behavior presents an immediate danger to themselves, may be placed in the restraint chair upon the authorization of the Shift Supervisor, who will be immediately notified of any situation. Inmates in immediate danger to themselves may need prior restraint devices implemented until such time as the restraint chair has been delivered or prior to Shift Supervisor approval for the chair.

C. PLACING AN INMATE IN THE RESTRAINT CHAIR:

1. Additional officers must be present to assist in the placement of an inmate in a restraint chair, with adequate coverage for officer station and key panel box operator. At no time will a single officer place an inmate in a restraint chair. If applicable, the Shift Supervisor will be present during the placement of an inmate in the restraint chair.
2. All straps and restraint devices within the context of the chair will be used and secured as to permit proper circulation of limbs.
3. Once the inmate is secured in the chair, medical staff will be notified to

examine the inmate for injury and proper circulation.

4. A photograph will be taken of all inmates when first placed in the restraint chair and given to the Shift Supervisor for proper documentation for Cover Letter and/or Physical Resistance Report.

D. INMATE MONITORING:

1. Immediately following the placement of an inmate in a restraint chair, medical staff will be notified and the inmate will be examined for possible injury. The Shift Supervisor and Medical Staff will assess an inmate in the restraint chair, not to exceed one-hour intervals.
   a) Each examination will be documented including the inmate's condition and the time of examination. If the inmate's behavior indicates more frequent observation, i.e. highly aggressive, continues to fight restraints, the on call Mental Health Counselor will be notified for possible alternative treatment.
   b) During the assessment of an inmate the restraints make it difficult for the Shift Supervisor or Medical Staff to complete an adequate assessment, the restraints will be modified to allow access to the inmate.
   c) During the assessment, staff will ensure the inmate is controlled at all times to eliminate harm to the inmate or staff.
   d) Upon completion of the assessment, the inmate will be returned to the restraint chair, if necessary.

2. The officer will supervise and monitor the inmate not to exceed fifteen (15) minute intervals, with appropriate documentation, until such time as the inmate is removed from the restraint chair. The time of the restraint removal will also be noted on the Floor Log and in the confinement Log.
   a) The officer will place himself in a position to observe the inmate and attempt to ask for a verbal response. When necessary, the officer will physically enter the cell with the assistance of additional officers if the situation warrants the opening of a secure door. If the inmate does not respond, the officer will ensure the inmate is breathing and observe his/her behavior. The officer will contact medical staff if additional appraisal is needed.
   b) Information recorded on the Administrative Confinement Log must reflect the inmate's actual condition, response or behavior.
   c) At any time the officer believes the inmate can safely be removed from the restraint chair, the officer will make a recommendation to the on-duty Shift Supervisor, who, in turn will access the situation and make the determination. If the Supervisor deems it necessary for further restraint, the reason for continuance will be

documented.

3. When an inmate is to continue in restraint past a one-hour period, the following will apply.
   a) A Sergeant or above must authorize the continuance of the restraints and must physically observe the inmate prior to authorizing the continuance.
   b) The supervisor or medical staff will assess the inmate's health at the end of one hour and a minimum of every hour afterward.
   c) The supervisor will record on the Incident Report and the Administrative Confinement Log the reasons for the continuation of restraints.

4. The one-hour evaluation must be designed as a safeguard and not a minimum time limit. Continuation of the inmate in restraints will be based on the situation as judged by the authorizing supervisor.

**...**

## MEMORANDUM OF LAW

The standard of review which must be applied by the Court is contained in Rule 56(a) of the Federal Rules of Civil Procedure which reads in pertinent part as follows:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the non-moving party, in this case, the Plaintiff. The plaintiff is then required to come forward with sufficient evidence to rebut the showing with affidavits or other relevant and admissible evidence. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the non-moving party's burden to come forward with evidence on each essential element of her claim sufficient to sustain a jury verdict. See Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). See also Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574,

587 (1986) [Plaintiff must produce specific facts showing that there is a genuine issue for trial.].

**THIRD FOURTH AND FIFTH CLAIMS: §1983 OFFICIAL CAPACITY CIVIL RIGHTS CLAIMS AGAINST MIKE SCOTT AS SHERIFF OF LEE COUNTY, FLORIDA**

If the Court determines that Christie's constitutional rights were not actually violated by any of the co-defendants, then the Defendant Scott is entitled to summary judgment as the issue of his customs or policies becomes moot. Rooney v. Watson, 101 F.3d 1378 (11th Cir. 1996); Gish v. Thomas, 516 F.3d 952 (11th Cir. 2008). If the Court determines that there is an issue of fact regarding the question of whether Christie's constitutional rights were violated, then the Defendant Sheriff is still entitled to summary judgment as there is no evidence that the Sheriff in his official capacity directly caused the violation to occur pursuant to his policies, customs, practices or procedures.

It is well settled that a government entity is not liable for the actions of its subordinates or employees in a cause of action brought pursuant to 42 U.S.C. §1983 by operation of the concept of respondeat superior/vicarious liability. Therefore, there must be evidence of a custom, policy, practice or procedure that provided the moving force behind, and the direct cause of, the alleged constitutional violation. There must be evidence of an affirmative link between the alleged violation and the alleged policy or custom. The Plaintiff must establish a direct causal connection between a custom or policy, once shown to exist in fact, and the alleged constitutional violation. See Monell v. Dept. of Social Services, 436 U.S. 658 (1978) and Fundiller v. City of Cooper City, 777 F.2d 1436 (11th Cir. 1985).

It is important to understand the distinction between a custom, practice or procedure and

an official policy. In the case of a formal, official policy that clearly authorizes unconstitutional behavior, a single incident of the unconstitutional behavior by a subordinate of the official policy-making authority is sufficient to bring a Section 1983 cause of action. See e.g. Monell, supra. However, the law is more stringent in its requirement of proof in the typical Section 1983 case where the custom, practice or procedure is not an official promulgated policy and rather is based upon some other theory that is not directly related to the actual unconstitutional act. Generally, in a case where the "policy of the governmental entity" is argued to exist through such an informal custom or practice, a single or isolated incident of a constitutional violation by an employee is insufficient to establish such an informal custom or practice. See City of Oklahoma v. Tuttle, 471 U.S. 808 (1985).

It is undisputed that the Defendant Scott does not have a policy as the final policy-maker for the LCSO that would directly cause a constitutional violation to occur as alleged. (See Exh "2" to Exh. "A"). In Bd. of County Comm'rs of Bryan County, Oklahoma v. Jill Brown, 520 U.S. 397, 404-15 (1997), the United States Supreme Court indicated:

> As our §1983 municipal liability jurisprudence illustrates, however, it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.
>
> Where a plaintiff claims that a particular municipal action itself violates federal law or directs an employee to do so, resolving these issues of fault and causation is straight- forward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying right. In any §1983 suit, however, the plaintiff must

> establish the state-of-mind of the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decision-maker has intentionally deprived the plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decision-maker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains....
>
> Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to insure that the municipality is not held liable solely for the actions of its employee....
>
> Claims not involving an allegation that the municipal action itself violated the law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof. That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the employee acted culpably....
>
> Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability. As we recognized in Monell and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a deprivation of federal rights.

(internal quotes and citations omitted.)

The Sheriff's policies regarding use of force and restraint devices are constitutional on their face as they do not authorize a corrections deputy to act with a malicious and sadistic intent for the very purpose of causing harm when applying force.[8] See Warren v. Perkins, 2009 WL 2882139 n. 2 citing Johnson v. Glick, 481 F.2d 1028 (2nd Cir. 1973)(malicious and sadistic

[8] See Medical Defendants' motion for Summary Judgment [DE 165-166] regarding the customs and policies related to medical care in the Jail and Exh "1" to Exh "A".

standard applicable to pre-trial detainee regarding use of force) and Sanchez v. McCray, 349 Fed. Appx. 479 (11th Cir. 2009)(use of pepper spray upon a mental health inmate with a heart condition not excessive. Wide range of deference given to prison official acting to preserve discipline and security. Prison guards need not wait until a disturbance reaches dangerous proportions before responding).[9]

The Plaintiff cannot now rely on her allegations as contained in the Fourth Amended Complaint [DE 113] to rebut the Defendant Scott's evidence regarding his official policies. The Plaintiff will have to prove that there was a custom, practice or procedure adopted by the Sheriff in his official capacity that would directly cause jail staff to apply force to an inmate maliciously and sadistically for the very purpose of causing harm and to show a deliberate indifference to a serious medical or mental health need, despite being subjectively aware of that need in March of 2009.[10]

To establish the existence of a custom or practice, it is generally necessary to show a persistent and wide-spread practice of the alleged unconstitutional behavior that existed before

---

[9] Chapter 951 Florida Statutes (2009) which governs county and municipal jails makes no reference to the use of O.C./pepper spray or a restraint chair. However, F.S. 951.23 (2009) subpart 10 makes it a misdemeanor crime for an inmate to violate a posted jail rule... (c) threat of bodily harm...(aa) refusing to obey a reasonable order...(ff) conduct which disrupts or interferes with security or orderly running of the institution...(pp) using abusive or obscene language. Yelling and screaming and banging is just as disruptive to the orderly running of a correctional institution as it would be to the orderly running of a courtroom. Furthermore, it is interesting to note that F.S. 944.105(4)(d) (2009) authorizes private corrections officers to use non-deadly force to enforce regulations and orders. Chapter 944 defines "prisoner" to include jail inmates. F.S. 944.35 (1)(a)(3) and (4) authorizes the use of force to prevent damage to property and to quell a disturbance. **It is also interesting to note that F.S. 394.9223 (2009) authorizes the use of O.C. pepper spray upon mental health inmates, while F.S. 916.1091 (2009) authorizes the use of a chemical agent, CN, upon mentally ill defendants.**

[10] See Warren, supra; Farmer v. Brennan, 511 U.S. 825 (1994) and Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985).

Christie's incarceration in March of 2009 and which amounted to the practice or custom of the governmental entity at the time of Christie's incarceration. Moreover, knowledge of such customs must be attributable to the Sheriff in his official capacity as a policy level-making official. Normally, random acts or isolated incidents are insufficient to establish a custom or practice. See Depew v. City of St. Mary, 787 F.2d 1496, 1499 (11th Cir. 1986); see also Brook v. Scheib, 813 F.2d 1191 (11th Cir. 1987); Brown v. City of Fort Lauderdale, 923 F.2d 1474 (11th Cir. 1991). In this case there is no evidence of a wide spread practice of violating inmates constitutional rights both as it would relate to the use of force and as to the provision of health care services. There is no evidence that Christie was known to corrections deputies to suffer from a psychiatric condition that rendered him incapable of obeying lawful commands and jail rules. More importantly there is no evidence that corrections deputies where informed by medical staff that Christie should not be exposed to pepper spray or the use of a restraint chair based upon his medical condition. (See Medical Defendants' Motion for Summary Judgment DE 165-166 and Exh "C"- PHS restraint flow sheet - No medical or mental health contraindications to restraints; See also, Exh."D" PHS 3/25/09 receiving screening form, "MENTAL HEALTH": Christie reported no history of mental health disorder including bi-polar.)

There is no evidence that any inmate incarcerated in the LCJ system prior to Christie's incarceration died as the result of being pepper sprayed or restrained in a restraint chair. Plaintiff cannot meet her burden to prove by admissible evidence that a wide spread practice of constitutional harm causally related to the type of constitutional violations alleged here, existed

at the time of Christie's incarceration and which was known to a policy level making official of the Sheriff's office.[11]

The Defendant Sheriff Scott has brought forth evidence of his official policies, in addition to testimony regarding the fact that his deputies are certified, trained, and not authorized to violate an inmates constitutional rights. (See Exh. "A"). The evidence establishes that Christie's constitutional rights were not violated as a direct result of this Defendant's policies, even when assuming they were in fact violated. Consequently, the Plaintiff must provide competent proof of the existence of a custom or practice and, even if successful in doing so, must also demonstrate that the custom or practice actually caused Christie's constitutional rights to be violated in this case in March of 2009. Furthermore, the alleged actions or inactions of the deputies themselves do not establish a custom or practice simply due to the fact that they are deputies. See Brown v. Neumann, 188 F.3d 1289 (11th Cir. 1999). The Sheriff is the final policy maker for the office of the Sheriff as an elected constitutional officer. See Article VIII, Section 1(d), Florida Constitution.

The Plaintiff's Fourth Amended Complaint attempts to hinge liability on a failure to train, supervise or discipline theory as well as a wide-spread practice theory. Plaintiff has a difficult burden of proof when pursuing a failure to train and supervise theory. Specifically, the Eleventh Circuit has recognized that:

---

[11]Post incident ratification theories do not satisfy the causal connection requirement announced by the United States Supreme Court in Bryan County, supra. There must be evidence that the custom or practice existed at the time of the incident in order to claim the incident was directly caused by the custom or practice.

> [i]t is not enough to show that a situation will arise and that taking the wrong course in that situation will result in injuries to citizens....City of Canton also requires a likelihood that the failure to train or supervise will result in the officer making the wrong decision. Where the proper response...is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise.

Sewell v. Town of Lake Hamilton, 117 F.3d 488, 490 (11th Cir. 1997)(internal citations omitted).

Moreover, there is **no constitutional duty** to train officers regarding a particular issue unless and until it is first shown by the plaintiff that the government entity was on notice that there was a problem of constitutional magnitude, and that, once on notice the governmental entity was deliberately indifferent to that knowledge and the need to train. See Gold v. City of Miami, 151 F.3d 1346 (11th Cir. 1998). In essence, the plaintiff must have evidence of a history or widespread practice of a prior constitutional abuse that would have put the Sheriff on notice of a need for improved training or supervision, and that the Sheriff deliberately chose not to correct the problem with more training and supervision. Gold, supra. More recently in Connick v. Thompson, __ U.S. __, 131 S.Ct. 1350, 179 L. Ed. 2d 417 (2011) the Supreme Court reminded the Courts that culpability for an alleged violation of a constitutional right is most tenuous when the claim turns on an alleged failure to train. Id. at 1359 (citing Oklahoma v. Tuttle, 471 U.S. 808 (1985)). In addition, the court rejected Thompson's evidence of previous constitutional violations committed by the defendant's employees in that case indicating that they were not identical enough to the *Brady*[12] violation that led to the violation of Thompson's rights. The Court concluded that evidence of very similar if not identical prior examples of

[12] 373 U.S. 83 (1963).

constitutional harm is needed to provide notice to the government entity so as to make it highly predictable that without training additional constitutional harm will result. In this case there is no evidence of a prior similar or identical case of constitutional harm. Therefore, the Sheriff cannot be liable pursuant to 42 U.S.C. section 1983 for an alleged failure to train and supervise.[13] (See Exhibits filed in support of this motion).

The Defendant Sheriff Scott is entitled to summary judgment on the Plaintiff's Third, Fourth and Fifth section 1983 claims regarding the use of force and restraint of Christie for the reasons set forth herein. In addition, to the extent the Sheriff can be liable for the policies and practices of the contracted medical care provider, PHS, the Sheriff is also entitled to summary judgement on the Section 1983 claims for the reasons set forth in the medical defendants' Motion for Summary Judgment [DE 165-166] and because the Sheriff, as a policy maker for the Sheriff's Office, contracted with PHS to provide medical care to inmates as he is not a licensed medical care provider, and thus was not deliberately indifferent to the serious medical and mental health needs of inmates.[14]

---

[13] Plaintiff may rely on the case of Thomas v. Bryant, 614 F.3d 1288 (11th Cir. 2010). This case was decided after Christie's death. The Thomas case involved inmates incarcerated by the State of Florida Department of Corrections for several years, and whom had long documented histories of serious mental illness that rendered them incapable of controlling their behavior in response to the use of O.C./pepper spray. Christie was incarcerated in jail for a few days and did not have a long documented history of mental illness that rendered him incapable of responding to commands and the use of pepper spray. (Plaintiff does not allege any facts indicating that Christie had a documented serious mental illness as found in Thomas. (DE 113)). Lastly, the attorneys for the Department of Corrections in Thomas litigated the case using the wrong legal standard, as noted by the Eleventh Circuit.

[14] Expert witnesses cannot define what a deliberate indifference is legally as this is a legal term. Woods v. Lecureuz, 110 F.3d 1215 (6th Cir. 1997); Berry v. City of Detroit, 25 F.3d 1342 (6th Cir. 1994). In addition, Courts have rejected expert opinions regarding police and corrections liability issues including opinions related to proper procedures. Gold v. City of Miami, 151 F.3d 1346 n.13 (11th Cir. 1998); Cook v. Roth, 402 F.3d 1092 (11th Cir. 2005) and Cottrell v. Caldwell, 85 F.3d 1480 (11th Cir. 1986).

## EIGHTH CLAIM/ASSAULT AND BATTERY

The Sheriff in his official capacity can be liable under state law for the intentional torts of his deputies if committed within the scope of their employment, and if not committed in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. See Richardson v. City of Pompano Beach, 511 So.2d 1121 ( Fla. 4th DCA 1987); Johnson v. Sackett, 793 So.2d 20,23 (Fla. 2nd DCA 2001); F.S.§768.28(9)(a) (2009).

The Sheriff's liability, if any, is dependent upon whether the evidence supports a finding that Defendants Falzone, Calhoun, Pyle, Hardin or DaRoss committed an assault and battery upon Christie. To the extent that Christie was not assaulted or battered through the use of excessive force or unlawful placement in fear by the defendant deputies, then the Sheriff would be entitled to summary judgment as to all or any of the individual acts which pertain to Defendants Falzone, Calhoun, Pyle, Hardin or DaRoss. Therefore, to the extent the Court grants in whole or in part the Defendants Falzone, Calhoun, Pyle, Hardin or DaRoss's motion for summary judgment on the state law claims of assault and battery based upon a finding that no assault or battery occurred, then the Defendant Sheriff would also be entitled to summary judgment.

## NINTH AND TENTH CLAIMS/NEGLIGENT HIRING, RETENTION, SUPERVISION

There is no evidence that any of the individual Defendant deputies were negligently hired, retained or supervised. They each were well qualified under state law to carry out the

functions of a corrections officer in the LCJ system. (See Exh. "A"). Therefore, the Sheriff is entitled to summary judgment for this reason. Furthermore, this type of negligence claim is dependent on a finding that the individual Defendant deputies assaulted and battered Christie while acting outside the scope of their employment or in a manner that would make the Sheriff immune for their behavior under state law. The purpose of this type of claim is to allow a plaintiff to recover from an employer for actions the employer otherwise would not be directly liable for. Mallory v. O'Neil, 69 So.2d 313 (Fla. 1954); Garcia v. Duffy, 492 So.2d 435,438 (Fla. 2nd DCA 1986); DeLaurentos v. Peguero, 47 So.3d 879 (Fla. 3rd DCA 2010). Consequently, if the Defendant Deputies did not commit any actionable wrong, then the Sheriff would be entitled to summary judgment on these claims as well. To the extent the Plaintiff's negligence claims are based upon a theory that the deputies were not properly trained based upon the subject matters taught or lack thereof, then the Sheriff would be entitled to immunity under state law regarding how to train his deputies. See Maybin v. Thompson, 514 So.2d 1129 (Fla. 2nd DCA 1987); Ursin v. Law Enforcement Co., LTD., 450 So.2d 1282 (Fla. 2nd DCA 1984) approved, 469 So.2d 1382 (Fla. 1985) (sovereign immunity barred claims for negligent instruction and supervision); Lewis v. City of St. Petersburg, 260 F.3d 1260, 1266 (11th Cir. 2001) (sovereign immunity barred claim regarding how to train officers in a shooting case); Cook, supra at1117-19 (11th Cir. 2005)(sovereign immunity barred claim regarding how to train officers in suicide prevention).

The motion should be granted.

**I HEREBY CERTIFY** that I electronically filed a copy of the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing

to the following this **18th** day of June, 2012 to: **TROY A. RAFFERTY, ESQ.** and **VIRGINIA M. BUCHANAN, ESQ.**, Levin Papantonio Thomas Mitchell Echsner Rafferty & Proctor, P.A., 316 S Baylen Street, Suite 600, Pensacola, FL 32502; **WILLIAM HAWAL, ESQ.** and **NICHOLAS DiCELLO, ESQ.,** Spangenberg, Shibley & Liber, LLP, 1001 Lakeside Avenue East, Suite 1700, Cleveland, OH, 44114 and **GREGG A. TOOMEY, ESQUIRE**, Bunnell & Woulfe, P.A., 1625 Hendry Street, Suite 203, Fort Myers, FL, 33901.

***s/Summer M. Barranco***
SUMMER M. BARRANCO, ESQUIRE
Fla. Bar No. 984663
PURDY, JOLLY, GIUFFREDA & BARRANCO, P.A.
2455 E. Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida 33304
Telephone: (954) 462-3200
Facsimile: (954) 462-3861
e-mail: summer@purdylaw.com
Attorneys for *Defendants Sheriff, Falzone, Calhoun, Pyle, Hardin, Croker, DaRoss, Peak, DiMarco & Bramblet*
Trial Counsel

***s/Richard A. Giuffreda***
RICHARD A. GIUFFREDA, ESQUIRE
Fla. Bar No. 705233
PURDY, JOLLY, GIUFFREDA & BARRANCO, P.A.
2455 E. Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida 33304
Telephone: (954) 462-3200
Facsimile: (954) 462-3861
e-mail: richard@purdylaw.com
Attorneys for *Defendants Sheriff, Falzone, Calhoun, Pyle, Hardin, Croker, DaRoss, Peak, DiMarco & Bramblet*
Trial Counsel